# SHARON *v.* TERRY *et al.*

## NEWLANDS *et al. v.* SAME.

*(Circuit Court, N. D. California.* September 3, 1888.)

1. ABATEMENT AND REVIVAL — DEATH OF PARTY — BILL OF REVIVOR — OBJECTIONS TO JURISDICTION.

Upon proceedings to revive a suit in equity, abated by the death of the complainant, for the purpose of executing a final decree which has been rendered in such suit, no objections can be taken which could have been urged when the original bill was pending, except want of jurisdiction, apparent upon the record. An attack upon a judgment or decree in a proceeding to revive it is a collateral attack, and can only avail when there is a want of jurisdiction, either of the parties or of the subject-matter.

2. MARRIAGE — FORGED CONTRACT — CANCELLATION — COURTS — FEDERAL CIRCUIT.

The circuit courts of the United States have jurisdiction to cancel a written contract of marriage on the ground of its forgery. Such contract, if genuine, and followed by the requisite consummation, imposes upon the husband from its date the obligation to support the wife, and confers upon the wife certain rights in his property, and such obligation and rights measure the sum or value of the matter in dispute in a suit to cancel such written contract, within the meaning of the acts of congress requiring a certain value to such matter in order to give the circuit courts of the United States jurisdiction. Where the controversy is not respecting the amount or value in dispute, such amount or value, when necessary to the jurisdiction, may be shown by the evidence produced in the case, or by affidavits filed when the question of jurisdiction is raised.

3. SAME — ACTION TO CANCEL — ABATEMENT AND REVIVAL — DEATH OF PARTY.

The right of action to cancel a marriage contract, which, if genuine, and followed by the requisite consummation as mentioned above, would create rights in the property of the alleged husband, survives to his executor or administrator.

4. SAME — ABATEMENT AND REVIVAL — TRANSFER OF PROPERTY.

The transfer of the property of the plaintiff in a suit to cancel a forged marriage contract while such suit is pending does not abate it, if the plaintiff retain a right during his life to claim the rents and profits thereof, and the purchasers or beneficiaries under such transfer are entitled to the benefit of the decree rendered in such suit canceling the contract, to protect the property from claims made under or by virtue of it.

5. COURTS — CONFLICTING STATE AND FEDERAL JURISDICTION.

Where the jurisdiction of the circuit court of the United States has attached in a suit brought by a citizen of a state other than that in which the court is held, the right of the plaintiff to prosecute his suit in such court to a final determination there cannot be arrested, defeated, or impaired by any subsequent action or proceeding of the defendant respecting the same subject-matter in a state court.

6. SAME — JURISDICTION FIRST ATTACHING.

Where different courts may entertain jurisdiction of the same subject, the court which first obtains jurisdiction will, with some well-recognized exceptions, retain it to the end of the controversy, either to the entire exclusion of the other, or to the exclusion so far as to render the latter's decision subordinate to that of the court first obtaining jurisdiction, and it is immaterial which court renders the first judgment or decree.

7. SAME — EXCEPTION TO RULE.

The exceptions to the rule that priority of jurisdiction controls priority of decision are — *First,* where the same plaintiff has asked, in different suits, a determination of the same matter; and, *second,* where the cases are upon contracts or obligations, which from their nature are merged in the judgment rendered, the subject upon which the first suit is founded having thus ceased to exist.

v.36f.no.6—22

8. SAME — STAYING PROCEEDINGS IN OTHER COURT — MARRIAGE — ANNULLING
    CONTRACT.
    The decree of a circuit court of the United States, canceling a forged mar-
    riage contract, may be used to stay the enforcement of judgments for prop-
    erty rights recovered upon such contract in a subsequent suit in a state court.

9. SAME — PROHIBITING FEDERAL ENJOINING STATE COURTS — REV. ST. U. S. § 720.
    Section 720, Rev. St., prohibiting injunctions by any court of the United
    States to stay proceedings in a state court, does not apply where the federal
    court has first obtained jurisdiction of the subject-matter of the proceedings
    and of the parties in the state court. This section must be construed in con-
    nection with section 716, Rev. St., which provides that the federal courts shall
    have power to issue all writs which may be necessary for the exercise of their
    respective jurisdictions, and agreeable to the usages and principles of law.

*(Syllabus by the Court.)*

Before FIELD, Circuit Justice, SAWYER, Circuit Judge, and SABIN, Dis-
trict Judge.

In Equity.   On demurrer.

Bill of revivor by Frederick W. Sharon, executor, against David S.
Terry and Sarah Althea Terry, his wife, and bill in the nature of revi-
vor and supplement, and to carry decree into execution, by Francis G.
Newlands, trustee, against the same.   These cases are brought to revive
and carry into execution a final decree of this court in the suit of *Will-
iam Sharon* v. *Sarah Althea Hill,* entered as of the 29th day of Septem-
ber, 1885.   On the 3d day of October, 1883, William Sharon, a citizen
of the state of Nevada, since deceased, instituted, in the circuit court of
the United States for the district of California, a suit in equity against
Sarah Althea Hill, now Sarah Althea Terry, to obtain its decree adjudg-
ing a certain paper in her possession, purporting to be a declaration of mar-
riage between them, to be a forgery, and enjoining its use, and directing its
cancellation.   In his complaint, after stating his citizenship in Nevada,
and the citizenship of the defendant in California, he sets forth, in substance,
this:   That he was, and had been for some years, an unmarried man; that
formerly he was the husband of Maria Ann Sharon, who died in May, 1875,
and that he had never been the husband of any other person; that there
were two children living, the issue of that marriage, and also grandchildren,
the children of a deceased daughter of the marriage; that he was possessed
of a large fortune in real and personal property, was extensively engaged
in business enterprises and ventures, and had a wide business and social
connection; that, as he was informed, the defendant was an unmarried
woman, of about 30 years of age, for some time a resident of San Fran-
cisco; that within two months then past she had repeatedly and publicly
claimed and represented, and then declared and represented, that she
was his lawful wife; that she falsely and fraudulently pretended that she
was duly married to him on the 25th day of August, 1880, at the city and
county of San Francisco; that on that day they had jointly made a dec-
laration of marriage, showing the names, ages, and residences of the par-
ties, jointly doing the acts required by section 75 of the Civil Code of
California to constitute a marriage between them; and that thereby they
became and were husband and wife according to the law of that state.

The complainant further alleged that these several claims, representations, and pretensions were wholly and maliciously false, and were made by her for the purpose of injuring him in his property, business, and social relations; for the purpose of obtaining credit by the use of his name with merchants and others, and thereby compelling him to maintain her; and for the purpose of harassing him, and, in case of his death, his heirs and next of kin and legatees, into payment of large sums of money to quiet her false and fraudulent claims and pretensions. He also set forth what he was informed was a copy of the declaration of marriage, and alleged that if she had any such instrument it was "false, forged, and counterfeited;" that he never, on the day of its date or at any other time, made or executed such document or declaration, and never knew or heard of the same until within a month previous to that time, and that the same was null and void as against him, and ought in equity and good conscience to be so declared, and ordered to be delivered up, to be annulled and canceled.

The complaint concluded with a prayer that it be adjudged and decreed that the said Sarah Althea Hill was not, and never had been, the wife of the complainant; that he did not make the said joint declaration of marriage, or any marriage, between them, and that she be perpetually enjoined and restrained from making said allegations, representations, and pretensions of marriage with him; that said contract or joint declaration of marriage be decreed and adjudged to be "false, fraudulent, forged, and counterfeited," and ordered to be delivered up, to be canceled and annulled, according to the practice of courts of equity in like cases; and that he might have such other and further relief as the nature and justice of the case might require. The complaint was verified in the usual form by his oath. It was filed, as stated above, October 3, 1883, and on the same day a subpoena was issued thereon, which was personally served by the marshal on the defendant, at San Francisco, two days afterwards,—October 5th. On the 3d of December following the defendant appeared in the suit by solicitors, giving her name as Sarah Althea Sharon, and demurred to the complaint on the alleged ground that it did not contain any matter of equity whereon the court could make any decree or give the complainant any relief against her. The demurrer was argued at the ensuing February term in 1884, and overruled, with leave to the defendant to answer by the next rule-day on the usual terms.[1] The case, as presented, was held to be a proper one for equitable relief. "This supposed contract," said the court, "is alleged to be a forgery, and to be fraudulent. It purports to be in writing, and to be signed by the parties; and the defendant claims by virtue of it to be the wife of complainant, and to have an interest in his property, which is alleged to be of the value of several millions of dollars. There is no adequate remedy at law for complainant against the claim set up under the alleged contract, and no means at law to annul it at the suit of complainant. The defendant can choose her own time for enforcing her claim under the alleged con-

[1] 20 Fed. Rep. 1.

tract, even after the death of the other party. Fraud has always been one of the principal heads of equity jurisdiction. The instrument in question is alleged to be a forgery and a fraud. If it is a forgery, it is of course a fraud also. The only parties who appear to have any personal knowledge of the facts, so far as indicated,—who personally know anything about this transaction,—are the two parties to the alleged fraudulent contract. One is alleged to be many years older than the other, the complainant being alleged to be sixty and defendant twenty-seven years old. The elder, in the ordinary course of nature, is more liable to die, and the contract, in such an event, would be in control of the defendant, without any testimony to defeat the fraud, if fraud there be. The right to several millions of property might be in after years affected and controlled by reason of the alleged fraud. A great wrong and injustice may be thus perpetrated in consequence of it, unless a court of equity can take hold of and cancel it. There is no way by an action at law that we are aware of to meet the conditions or effectually dispose of this instrument." 10 Sawy. 49, 50, 20 Fed. Rep. 3. And again: "If there is no remedy in equity for such a wrong as is charged, then the law is indeed impotent to protect the community against frauds of the most far-reaching and astounding character." *Sharon* v. *Hill*, 10 Sawy. 48, 20 Fed. Rep. 1. After the case had been commenced in the circuit court of the United States, and process served, the defendant, by the name of Sarah Althea Sharon, commenced an action in one of the superior courts of the city and county of San Francisco against the said William Sharon, alleging in her complaint that they had been married by virtue of the said declaration of marriage,—that is, the same contract for the cancellation of which, on the alleged ground of its forgery, the suit in the circuit court of the United States had been commenced,—and praying that her said marriage might be declared legal and valid, and then that she might be divorced from him by reason of certain infidelities to his marriage contract committed by him, which are specially set forth. In that complaint, assuming, without stating, what was generally known in the community, that the defendant was a man of large wealth, and had a large income, she alleged that when they intermarried he did not have over $5,000,000, and that his income did not then exceed the sum of $30,000 a month, but that since such intermarriage they had, "by their prudent management of mines, fortunate speculations, manipulations of the stock market, and other business enterprises, accumulated in money and property more than ten millions of dollars, ($10,000,000,) so that now the defendant has in his possession or under his control money and property of the value of at least fifteen millions of dollars, ($15,000,000,) from which he receives an income of over one hundred thousand dollars per month." She therefore further prayed that an account might be taken of their business transactions to ascertain their common property, in order that it might be equitably divided between them. William Sharon filed an answer to that complaint, denying, among other things, that he was ever married to the said Sarah Althea, and averring that the said alleged declaration of marriage between them, purporting to have been signed by

him, was a false and forged document, which he had never signed, and never heard of until within 60 days then past. When the defendant, in the circuit court, upon the overruling of her demurrer, was called upon to answer, she set up as a plea in abatement to that suit the pendency of the action in the superior court of the city and county of San Francisco, upon the theory that, as that action, though subsequently commenced, was founded upon the assumed validity of the alleged marriage contract, and involved a determination of that question, and the action, after being removed to the federal court, had been remanded back to the state court by stipulation of parties, and was then on trial, the circuit court of the United States ought to stay its proceedings in the original suit until the state court had expressed its opinion in reference to the validity of the contract in question, and then accept its judgment as conclusive.

The plea also set up that the circuit court of the United States had no jurisdiction of the case, on the ground that the plaintiff was, and had been for more than three years, a resident and citizen of California. The plaintiff traversed both pleas, and the court held both to be bad, the first because the two suits were not identical, but for different objects, —the one proceeding upon an assumed valid contract, and asking for a divorce and a division of the community property, and the other seeking a cancellation of the contract for alleged forgery,—and because the two suits were pending in courts of different jurisdiction. *Stanton* v. *Embrey*, 93 U. S. 548; *Gordon* v. *Gilfoil*, 99 U. S. 169, 178. The second plea as to the citizenship of Sharon was held to be false, no testimony impeaching the allegations of the complaint in that respect having been offered. 10 Sawy. 394, 22 Fed. Rep. 28. These pleas having been overruled, the defendant was allowed 30 days to answer to the merits, and accordingly, on the 30th day of December, 1884, she filed such answer. In the mean time, subsequent to the disposition of the special pleas of the defendant, the superior court of the city and county of San Francisco had decided the case before it, holding the said declaration or contract of marriage to be a genuine and valid instrument, by virtue of which the parties thereto had become husband and wife. In her answer, therefore, the defendant not only denied the several allegations of the complaint as to the citizenship of the plaintiff, as to the plaintiff's never having been the husband of any other person than Maria Ann Sharon, and as to her being an unmarried woman, and that her "claims were made for any other purpose but that of obtaining the recognition and support justly due" to her as wife of the plaintiff, but set up as a separate defense the action of the superior court of the city and county of San Francisco, and its judgment that the said alleged declaration of marriage was a genuine instrument by which the parties were made husband and wife. A supplemental answer averred that the state court had filed its decree and findings, reaffirming its adjudication as to the genuineness of that instrument. One of its findings set forth the alleged marriage contract, and added, "which was the only written declaration, contract, or agreement of marriage ever entered into between said parties; and at

the time of signing said declaration plaintiff and defendant mutually agreed to take each other as, and henceforth to be to each other, husband and wife." To these answers replications were filed, whereupon proofs were taken by the parties, which occupied several months. On the 29th day of September, 1885, the cause was submitted on the pleadings and proofs, after elaborate arguments of counsel. While it was pending before the court, undecided, and on November 13, 1885, the plaintiff, William Sharon, died. The decree, when rendered, was therefore entered as of the day when the cause was submitted, in accordance with the usual practice in such cases. By that decree it was ordered and adjudged that the alleged declaration of marriage was not, nor was any part thereof, signed or executed on said 25th day of August, A. D. 1880, or at any time, by the plaintiff, William Sharon; that it was not his declaration, contract, agreement, or other instrument; but was a false, counterfeited, fabricated, forged, and fraudulent instrument, and as such was null and void; and that the said instrument, within 20 days after notice of the decree to the defendant, or to her solicitors, should be delivered by her to, and deposited with, the clerk of this court, to be indorsed, "Canceled;" and that upon such delivery the clerk should write across the same, "Canceled," by virtue of this decree, and sign his name, and affix thereto the seal of this court; and that the document should thereafter remain in the custody of the clerk, subject to the further order of the court. The decree concluded as follows: "And it is further ordered, adjudged, and decreed that the respondent herein, Sarah Althea Hill, her heirs, assigns, executors, administrators, and all persons claiming any interest thereunder by or through said respondent, and her and their agents and attorneys, be, and they and each and all of them are, hereby perpetually enjoined from alleging the genuineness or the validity of said instrument, and from making any use of the same, in evidence or otherwise, to support any right claimed under it, or making any claim, or setting up any right, interest, or claim of any kind, under or by virtue of said instrument or declaration of marriage, either as wife of complainant, or for any interest in property or right of any kind or nature against said complainant, his heirs, executors, administrators, or successors in interest, and that complainant recover his costs of suit." William Sharon left a last will and testament, in which he named his son, Frederick W. Sharon, and his son-in-law, Francis G. Newlands, as executors. Newlands declined to act, and to Frederick W. Sharon, as sole executor, letters testamentary were issued. As such executor he, on March 12, 1888, filed one of the bills, the titles of which are given above, to have the suit revived in his favor as such executor, so that proceedings may be had for the enforcement of the decree. He alleges that the suit and proceedings under the decree have abated by the death of Sharon; that the alleged marriage contract, adjudged to be a forgery, has not been surrendered for cancellation, as ordered by the decree, and he fears that the said defendant will claim and seek to enforce property rights, as the wife of William Sharon, by virtue of that written declaration of marriage, under the decree of another court, (the superior court.

of the city and county of San Francisco,) essentially founded thereon, which, as he is advised, is wholly subject and subordinate to the decree of this court, contrary to the true intent, meaning, and spirit of the perpetual injunction ordered, and in violation thereof. He alleges the marriage of the defendant with David S. Terry, who is joined as a defendant with her, and prays the process of the court to the end that the said suit and proceedings therein may stand revived in his favor, and be in the same condition and plight in which they were at the time of the abatement. On the 4th of November, 1885, William Sharon executed a deed of his property, real and personal, to his son-in-law, Francis G. Newlands, and his son, Frederick W. Sharon, subject to various trusts. Without specifying the details of the said trusts it may be stated generally that they are designed to secure for some years the protection and management of the property, which is of great value, amounting to several millions of dollars, and its final distribution to the children and grandchildren of the grantor, and to others related by blood or marriage to him. It reserves, however, a power in the grantor to require at any time the trustees to pay over to him "the whole or any part of the net income, rents, issues, and profits of said property" remaining after making certain monthly payments to his children, and to his son-in-law for his grandchildren. It also reserves a power in him to direct a distribution and conveyance of his property at any time during his life to the beneficiaries named, instead of at the periods designated therein. It concludes with a solemn asseveration that the said Sarah Althea Hill was not, and never had been, his wife; that he never proposed marriage to her, or married her in any form or manner whatever; that the so-called marriage contract and "dear wife" letters introduced by her in evidence in the state court were forgeries; that all her claims to wifehood were based upon forgeries and perjuries, and he "specially empowers and directs" the trustees "to vigorously contest, in every court where a contest can be made," her false claim and pretensions. Frederick W. Sharon has since resigned the duties and powers of said trust, and the execution of the trusts has devolved upon the other trustee named, Francis G. Newlands. And he, as such trustee, and other parties and beneficiaries under the trust deed, on April 14, 1888, filed the other of the bills, the titles of which are given above, which is an original bill in the nature of a bill of revivor and supplement to carry the decree in *Sharon* v. *Hill* into execution, for their benefit. It sets forth with particularity the proceedings in the suit in the circuit court of the United States, and the decree rendered therein, and its non-execution and the abatement of the suit by the death of Sharon, and the execution, and contents of the trust deed; also the commencement and prosecution by said Sarah Althea of the action in the state court, claiming to be his wife under the said declaration of marriage, and the proceedings and judgment therein. It avers that the matter in suit in the circuit court exceeded the sum or value of $500; that the property of Sharon was of the value of $5,000,-000 over and above his debts and liabilities; that said Sarah Althea Hill claimed all the rights of a wife, under the laws of the state of California,

in the property of the plaintiff, and to a reasonable support from him as her husband, and to a share in the property acquired by him after the date of said declaration of marriage; that such support was of the value of at least $500 per month, if she was in fact his wife; that she also claimed and asserted a right to one-half of all the property acquired by said William Sharon after the 25th day of August, 1880, and that she is entitled as her share of such property to at least $5,000,000; that said claim was disputed as false and fraudulent by the said William Sharon, and is now disputed by his successors in interest, and that it was the object of the suit in this court to protect the property and property rights of said William Sharon, and of the complainants, as his successors in interest, against said claims, which were settled by the decree of this court enjoining her from asserting any property rights, either as the wife of complainant, or under or by virtue of said declaration of marriage.

The bill also sets forth that the state court expressly found and adjudged that the declaration of marriage (which the circuit court has held to be a forgery, and annulled) was the only written declaration, contract, or agreement of marriage ever entered into between the parties, and upon such findings and adjudication rendered its judgment, declaring that Sarah Althea was his wife, and granting her a divorce from such marriage, and awarding her one-half of all the community property accumulated by him after August 25, 1880, and ordering an accounting to ascertain the community property; that the defendant, now Sarah Althea Terry, is threatening and endeavoring for the first time to proceed with an accounting under her judgment of divorce, for the purpose of enforcing a division of the property acquired by William Sharon after August 25, 1880, and that she is seeking to discover and inspect the books of account kept by him, to the great injury and harassment of the complainants. The bill also sets forth that the state court made an allowance of alimony by its order, as follows: "It is hereby ordered that the defendant, William Sharon, pay to the plaintiff, Sarah Althea, or her order, on or before the 9th day of March, 1885, the sum of $7,500, as alimony herein; and the further sum of $2,500 on or before the 8th day of April, 1885; and the same amount on or before the 8th day of each and every month hereafter as alimony, until the further order of this court;" that this judgment was afterwards modified, on appeal, by the supreme court of the state, on the 31st day of January, 1888, by striking out therefrom the words, "the sum of $7,500, as alimony herein, and the further sum of $2,500 on or before the 8th day of April, 1886," and inserting in the stead and place of those words, "the sum of $1,500, as alimony herein, and the further sum of $500 on or before the 8th day of April, 1885;" that the said defendant Sarah Althea Terry is seeking to enforce that judgment, as modified, to the injury and harassment of the complainants; that the said judgment of alimony was founded upon and subsists essentially by virtue of the said declaration of marriage, adjudged by this court to be forged and fraudulent and fabricated, and that its execution and enforcement ought in equity to be restrained, as an infringement of the decree and prior jurisdiction of this court, and of the rights of the complainants there-

under. The complainants therefore pray that the decree in the original suit, and the proceedings in enforcement and execution thereof, may stand revived, and be in the same state, plight, and condition in which the same were at the time of the death of the said William Sharon; and that it may be declared that the complainants, as trustees and beneficiaries, as aforesaid, are entitled to revive the said decree and proceedings thereunder for the enforcement thereof, and to have the full benefit thereof, and to fully enforce and execute the same; and that the decree may be construed and adjudged to forbid and enjoin any and all proceedings in execution or enforcement of the said judgment of the said superior court for alimony; and for an accounting and division of the community property; and that said judgments may be declared void and of no effect as against the complainants, so far as they authorize any recovery of property or property rights; and that the defendants may be restrained, pending the suits, by an injunction, from taking any further proceedings to enforce or execute the said judgment for alimony, or the the said judgment for an accounting and division of community property, and from commencing or maintaining any further suit or suits, proceeding or proceedings, of any kind, under or upon either of said judgments, against the complainants, or any of them; and that such injunction, upon the hearing, may be made perpetual; and that they may have such other or further relief in the premises as may be just.

To these two bills, to revive and enforce the decree in the case of *Sharon* v. *Hill*, the defendants have appeared and demurred. The principal grounds of the demurrer in each case are that the court has no jurisdiction of the subject-matter of the suits, or to grant the relief prayed; that the plaintiffs do not show any right or title to maintain their respective suits; and that there is ambiguity and uncertainty in the bills, in that they fail to show what particular property is involved.

*W. F. Herrin,* for complainant.

*Stanley, Stoney & Hays,* for respondents.

FIELD, Justice, *(after stating the facts as above.)* As appears by the statement herewith filed, the decree of this court in the case of *William Sharon* v. *Sarah Althea Hill,* entered as of the 29th of September, 1885, adjudged the alleged declaration of marriage between the parties, purporting to be executed on the 25th of August, 1880, to be a forgery, and ordered it to be surrendered and canceled, and enjoined the defendant, and all parties claiming under her, from making any use of the same, as evidence or otherwise, to support any claim advanced under it, as wife of William Sharon, or to any interest in property of any kind against him, or his heirs, executors, or successors. William Sharon having died, Frederick W. Sharon, as the executor of his last will and testament, has filed one of the bills before us to revive and carry that decree into execution. Francis G. Newlands, as acting trustee, under a deed of trust executed by William Sharon a few days before his death, and certain beneficiaries under that deed, have filed the other bill before us, which is an original bill in the nature of a bill of revivor and supplement. It also

has for its object to revive the decree in the original suit, and enforce its execution for their benefit. The demurrers are in form to these bills, but the objections raised by them are intended to apply to the original bill in the suit of *Sharon* v. *Hill*, and have been argued as though they were in terms directed against it, the position of counsel being that the circuit court possessed no jurisdiction of the subject-matter of that suit, and no power to make the decree entered therein; that the same was absolutely null and void, and therefore that there is nothing to revive. These objections could have been urged when the original bill was pending, and in fact were presented so far as they relate to the power of the court to grant the relief prayed. 10 Sawy. 50, 20 Fed. Rep. 3. And the general doctrine is that objections taken to the original bill, or which might have been thus taken, cannot again be made upon a bill of revivor, where the original suit has abated by the death of the plaintiff. The only questions which can then be raised are whether the party in whose name the revival is asked has succeeded to the interests, rights, or claims of the deceased, or has become the legal representative of his estate, so as to enable him to continue the prosecution of the suit, if not already determined, or to revive it so as to enforce the judgment rendered, if not already executed. If the suit be pending, undetermined, questions previously decided cannot be again raised and reconsidered any more than they could if the plaintiff had not died, and, if the suit has gone to final judgment, objections which might have controlled it, if presented in time, cannot be afterwards urged against its validity any more than they could by a stranger to the record. An attack upon a judgment in a proceeding to revive it is a collateral attack, and can avail only when there is an absolute want of jurisdiction, either of the parties or of the subject-matter. The leading counsel of the defendants accepts this position, although his argument has covered a wider circuit, and embraced many matters which could only be considered by us if we were sitting as a court of appeal, or upon a rehearing of the case. We reminded him, indeed, that we had no more power in the matter than the court which originally decided the case,—the court is the same, its members only being different,—but we did not limit his argument. We felt the exceeding gravity of the case, and the serious consequences to the parties, whichever way the controversy may be finally determined. If we are to take the judgment of this court as valid and binding, and as importing absolute verity, as the law compels us to do, if the court had jurisdiction of the parties and subject, a case is presented which from its enormity may well make society shudder. We therefore have listened to and with assiduous care have examined every suggestion of the learned counsel, that we might reach, if possible, a just conclusion. The main point of his argument is that the original suit was brought to cancel a piece of evidence which might assist in establishing a marriage between the parties, but which of itself had no value capable of pecuniary estimation; that no such value is alleged in the pleadings, or could be; and therefore the suit is not within the jurisdiction of the circuit court of the United States, under the act of congress of March 3, 1875, in force when the suit was

commenced, prescribing and limiting that jurisdiction. That act, as applicable to suits between citizens of different states, is as follows:

"The circuit courts of the United States shall have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature, at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of $500, * * * in which there shall be a controversy between citizens of different states." Act March 3, 1875, (18 St. U. S. c. 137.)

This statute, as counsel very justly claims, requires that there shall be a matter or thing in dispute susceptible of a pecuniary valuation, and exceeding the sum or value of five hundred dollars; that the money demand or thing of value must be directly involved in the suit which is tendered for judicial action. We accept the statement as accurately expressing the limits of the jurisdiction of the circuit court, under the statute of 1875. A subsequent statute requires the sum or value of the matter in dispute to be $2,000. By matter in dispute, as held by the supreme court, is meant, in an action at law, "the subject of litigation, the matter for which suit is brought, and upon which the issue is joined, and in relation to which jurors are called, and witnesses are examined." If the case be one in equity instead of law, the definition is equally explicit, the words "in relation to which jurors are called" being omitted. The matter at issue in the original suit of *Sharon* v. *Hill*, was the alleged contract of marriage between the parties, purporting to have been executed on the 25th day of August, 1880, and the object of the suit was to enjoin its use, and obtain its cancellation as a forgery and a fraud. All the testimony was directed to the establishment of the genuineness of that instrument or to prove its forgery. As the fact was found one way or the other the character of the judgment would be determined. But it is insisted that this contract was not capable of pecuniary estimation; if forged, as claimed on one side, it would be a valueless paper; if genuine, as claimed on the other side, it could of itself establish no property rights in the defendant. What might ultimately result from the marriage which it might aid in proving was only prospective and contingent, lying among mere possibilities. We do not so construe the alleged contract, or the rights it conferred upon the alleged wife, and the obligations it imposed upon the alleged husband. If genuine and valid, it established a marriage between the parties from its date, assuming, as claimed by her, that it was followed by the requisite consummation.[1] It is not a contract to marry at a future day, or an admission that a marriage has already taken place. It is an instrument by which, on the assumption mentioned, the marriage relation was immediately created. It therefore imposed upon him from that date all the obligations of a husband which the law creates, and among which is that of supporting the defendant as his wife in a manner suitable to his condition of life. In her complaint in the state court, which became by her plead-

---

[1] Note by Field, Justice. By requisite consummation is meant what the law required to render the contract operative as a marriage, such as openly living together as man and wife, or, as the statute states, "a mutual assumption of marital rights, duties, or obligations." Civil Code, § 55.

ings in the circuit court a part of the record there, she assumes that he was, when married, worth $5,000,000, for she avers that he was not then worth more than that sum, with an income of $30,000 a month, and she alleges that since then, by their joint prudent management, he has become worth $10,000,000 more, and his income has increased to $100,000 a month. A reasonable allowance for her support, which she might claim from him by virtue of that contract of marriage, if genuine and valid, would greatly exceed the amount required for the jurisdiction of the court. Again, the contract, if genuine and valid, placed her in a position to claim her rights to a portion of the community property; that is, property acquired by the earnings of both since its date. She alleges in the state suit that such earnings amounted to $10,000,000, and if so, under the law, as his wife, she would be entitled to one-half thereof on his decease, against any attempted testamentary disposition. It may be true that he could, notwithstanding the marriage, have disposed of the community property, given it away, perhaps, so as to cut off any claim by her; but the law will not presume that a husband will act so as to defeat any rights which his wife might otherwise justly claim under the law, nor will a remedy of a court of equity be refused because one may place his property where a claim cannot be enforced against it. Again, the contract, if genuine and valid, gave her an inchoate right of dower in the real property, which he then possessed in the District of Columbia, amounting in value to $300,000. That right, though to be enjoyed only in case of her surviving him, had a present substantial value, capable of pecuniary appraisement, and of which he could not deprive her by any conveyance of the property without her joining with him. Tables are framed by which the value of such interest is estimated according to the probable duration of the lives of the parties; and compensation for the value of such interest is constantly made in the transfer of real property in states where the right of dower is allowed. 2 Scrib. Dower, c. 24, tables in appendix. Such right in the real property of Sharon in the District of Columbia would greatly exceed in value the amount required to give jurisdiction to this court. We are therefore of opinion that an instrument, such as the declaration of marriage,—which, if genuine, and followed by the requisite consummation as claimed, would impose upon the plaintiff the obligation to support the defendant Sarah Althea in a manner suitable to his condition; that would give her a right to claim one-half of the property in California, subsequently acquired by him, alleged to be of the value of $10,000,000; and would give her an inchoate right of dower in real property in the District of Columbia, worth $300,000,—may be safely treated as having a pecuniary value exceeding $500, the amount necessary to give the circuit court jurisdiction when the suit was commenced. It is true, there is no statement in the pleadings in the original suit of the value of the property of the complainant. It is only alleged that he is possessed of a large fortune in real and personal property; but that its value amounts to several millions of dollars does appear in the evidence presented in that case, and that is all that is necessary to maintain the jurisdiction. It is well

settled that where the controversy is not respecting the amount or value of the matter in dispute, such amount or value, when necessary to the jurisdiction, may be shown by the evidence produced in the case, or by affidavits filed in behalf of the parties. On this ground the affidavits as to the value of real property owned by William Sharon in the District of Columbia, and also of the value of other property owned by him, were allowed to be filed during the argument. In *Ex parte Bradstreet*, 7 Pet. 634, application was made to the supreme court of the United States for a *mandamus* to compel the district judge of the Northern district of New York to reinstate and proceed to try certain writs of right to land, which were dismissed by him, because it did not appear that they involved the required amount to give the court jurisdiction, and to admit such amendments in the pleadings or such evidence as might be necessary to show that amount. In granting the *mandamus*, the court, by Chief Justice MARSHALL, said:

"In cases where the demand is not for money, and the nature of the action does not require the value of the thing demanded to be stated in the declaration, the practice of this court and of the courts of the United States is to allow the value to be given in evidence. In pursuance of this practice, the demandant in the suits dismissed by order of the judge of the district court had a right to give the value of the property demanded in evidence, at or before the trial of the cause, and would have a right to give it in evidence in this court."

See, also, *Wilson* v. *Blair*, 119 U. S. 387, 7 Sup. Ct. Rep. 230, and *Den* v. *Wright*, Pet. C. C. 64, 73.

The practice of admitting such evidence as to the value of the matter in dispute, in order to give the supreme court of the United States jurisdiction to review the judgments of inferior tribunals, where such value does not appear upon the records, is followed at every term. The doctrine for which the learned counsel contends, if successfully maintained, would strip the federal courts of the most important branch of their jurisdiction in equity cases. That jurisdiction is remedial and preventive, and, to frustrate fraud and further justice, may be invoked for the reformation, delivery, or enforcement of contracts or other instruments, or for their surrender or cancellation.

"It is obvious," says Story in his treatise on Equity Jurisprudence, "that the jurisdiction exercised in cases of this sort is founded upon the administration of a protective or preventive justice. The party is relieved upon the principle, as it is technically called, *quia timet;* that is, for fear that such agreements, securities, deeds, or other instruments may be vexatiously or injuriously used against him, when the evidence to impeach them may be lost; or that they may now throw a cloud or suspicion over his title or interest." Vol. 2, § 694.

And again:

"If an instrument ought not to be used or enforced, it is against conscience for the party holding it to retain it, since he can only retain it for some sinister purpose. If it is a negotiable instrument, it may be used for a fraudulent or improper purpose, to the injury of a third person. If it is a deed purporting to convey lands or other hereditaments, its existence in an uncanceled state necessarily has a tendency to throw a cloud over the title. If it is a mere

written agreement, solemn or otherwise, still, while it exists, it is always liable to be applied to improper purposes, and it may be vexatiously litigated at a distance of time, when the proper evidence to repel the claim may have been lost or obscured, or when the other party may be disabled from contesting its validity with as much ability and force as he can contest it at the present moment." Id. § 700.

Now, these instruments, which may be thus controlled by the court, are only evidence of the right to the things to which they relate. They are not the things themselves, and in exercising jurisdiction to compel their reformation, delivery, or enforcement, or their surrender or cancellation, the court is merely acting upon the evidence by which the possession and enjoyment of the things may be advanced or defeated. The value of instruments, in the sense by which the jurisdiction of the court is determined, is the value of the property, the possession or enjoyment of which may be thus affected. Suits to cancel forged contracts, such as a forged deed, are of common occurrence. What is the value of the instrument in controversy in such cases? If it be forged, its actual value is nothing; but, for purposes of jurisdiction over it by the court, it must be held to have, to the rightful owner of the property, the value of the property, the possession and enjoyment of which is imperiled by it. That such is the general understanding of the profession we have no doubt, for we can find no case where jurisdiction of the court has been denied, in the multitude of instances where it has been invoked, because such instrument is incapable of pecuniary estimation. It is everywhere assumed that the property which could be affected by it, if genuine, is the measure of its value for the purposes of jurisdiction. We might also refer, in support of this view, to that branch of equity jurisdiction which is exercised in discovering testimony or perpetuating it. What is the measure of value in such cases? Clearly, for purposes of jurisdiction, it must be estimated with reference to the value of the property in relation to which it is desired to discover or perpetuate the testimony. A court of equity having jurisdiction to lay its hands upon and control forged and fraudulent instruments, it matters not with what pretensions and claims their validity may be asserted by their possessor; whether they establish a marriage relation with another, or render him an heir to an estate, or confer a title to designated pieces of property, or create a pecuniary obligation. It is enough that unless set aside, or their use restrained, they may impose burdens upon the complaining party, or create claims upon his property by which its possession and enjoyment may be destroyed or impaired. It is of no consequence, therefore, that the bill in the original suit of *Sharon* v. *Hill* may contain matters appropriate to a suit of jactitation of marriage in a spiritual court of England. It also presents matters of which a court of equity in that country and in this has always had jurisdiction; that is, a case where the possession of a forged document by the defendant is alleged, purporting to be executed by the plaintiff, which, if genuine, would impose obligations upon him, and create claims upon his property. The learned counsel of the defendants also contends that the bills cannot be maintained on the ground

that the plaintiffs show no title in themselves or legal capacity to maintain the suits. As to the bill of revivor by the executor, Frederick W. Sharon, this position is assumed upon the theory that the decree in the original suit is self-executing; that the cause of action in that suit did not survive to the executor; that he only avers that he is the "personal representative" of the deceased plaintiff, without stating that any estate of the deceased has come into his hands. As to the original bill in the nature of a bill of revivor by Newlands and others, the further position is assumed that the original suit abated by the transfer by William Sharon of his property to trustees, under the deed of trust of November 4, 1885. To these several positions there is a ready and satisfactory answer found in the language of the original decree, in the law prescribing the powers and duties of executors, and in the terms of the deed of trust. The original decree is not self-executing in all its parts. It may be questioned whether any steps could be taken for its enforcement until it was revived. But if this were otherwise, the surrender for cancellation of the alleged marriage contract, as ordered, requires affirmative action on the part of the defendant. The relief granted is not complete until such surrender is made. When the decree pronounced the instrument a forgery, not only had the plaintiff the right that it should be thus put out of the way of being used in the future, to his harassment and the embarrassment of his estate, but public justice required that it should be formally canceled, that it might constantly bear on its face the evidence of its bad character whenever and wherever presented or appealed to. In *Railroad Co.* v. *Schuyler*, 17 N. Y. 592, 599, the court of appeals of New York said:

"There is no head of equity jurisdiction more firmly established than that which embraces the cancellation of instruments which are capable of a vexatious use after the means of defense at law may become impaired or lost, or when they are calculated to throw a cloud upon the title or interest of the party seeking relief. * * * Whatever their character, if they are capable of being used as a means of vexation and annoyance, if they throw a cloud upon title, or disturb the tranquil enjoyment of property, then it is against conscience and equity that they should be kept outstanding, and they ought to be canceled."

In *Peake* v. *Highfield*, 1 Russ. 559, a case which came before Lord Gifford, master of the rolls, in 1826, the bill prayed that an instrument purporting to be a deed of conveyance of real estate by a person since deceased might be delivered up to be canceled. The report of the case states that there was strong evidence that the deed was forged, though the defendant, who was charged with the commission of forgery, stated in his sworn answer that the deed was executed by the party whose deed it purported to be, and a witness testified that he was present at its execution. The defendant's counsel insisted on three points—"*First*, that a court of equity had no jurisdiction on the ground of forgery; *secondly*, that, even if the court had jurisdiction in such a case, it would never decree an instrument to be canceled on the ground of its being a forgery, without sending the question to be tried by a jury; *thirdly*, that, at all

events, it was impossible, in the present case, to order the deed to be canceled without a trial at law, since there was a witness who swore he saw it executed." The master of the rolls maintained the jurisdiction of the court, although he ordered an issue to try the fact of forgery, and said:

"This court has jurisdiction to order a forged instrument to be delivered up and canceled. In *Bishop of Winchester* v. *Fournier* [2 Ves. Sr. 446] several cases are mentioned in which forged instruments have been ordered to be delivered up; and they are referred to by Lord REDESDALE as unquestioned authorities. In some of them the court made the order at once that the instrument should be delivered up, without sending the question to be tried by a jury. In *Masters* v. *Braban*, [1 Russ. 560,] 10th July, 1735, the decree made at the hearing declared a deed to be a forgery. It does not appear that the plaintiffs in the cause prayed that the deed might be declared to have been forged, or might be delivered up to be canceled; yet the court made the declaration, and gave the plaintiffs the consequential relief. In *Seccombe* v. *Fitzgerald* [1 Russ. 561] the bill was filed to set aside certain notes, and it also impeached a bond which was alleged to be forged. The decree with respect to the bond was that it should be delivered up to be canceled."

In *Pierce* v. *Webb*, which was before Lord Chancellor THURLOW in 1792, and is reported in a note to 3 Brown, Ch. 16, 17, the bill prayed that a certain lease of land might be declared fraudulent and delivered up to be canceled. It was contended on the part of the defendants that no use could be made of the lease at law, and that equity could not, in such a case, compel the delivery of a deed; and, further, that the defendant Stalker, having proved expenses for lasting improvements, was entitled to those allowances; but the lord chancellor decreed for plaintiff, with costs, and ordered the lease to be delivered up to be canceled, and did not admit any allowances for improvements, saying that "it has never been doubted that if a man would create a forged deed, (of which no use could be made at law,) yet equity will interfere and deliver it up." The doctrine of these cases, as observed by counsel, is in accordance with the statute of this state, which declares that "a written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and ordered to be delivered up or canceled." Civil Code, 3412. The cause of action set forth in the original suit survived to the executor. The object of that suit was to set aside and cancel an instrument which, if genuine and valid, created a claim on the part of the defendant to be supported out of the property of the plaintiff, and inchoate rights which, on his death, would entitle her to a large share of that property. Had no such suit been brought by William Sharon, his executor could have brought one. Indeed, it would be his duty to do so if he believed the instrument a forgery. For the same reasons it is his duty to see that the decree is enforced so far as it may be necessary to protect the property of the deceased against any fraudulent claims, or interfere in any way with its disposition, as directed by his will, and for that purpose to seek a revival of the decree. Under the law of this state, the executor or administrator, when there is no will, is en-

titled to the possession of all the real and personal property of the deceased until the estate is fully administered, or a decree of distribution is made by the probate court. The heirs or devisees of the deceased can only take possession upon such distribution. Until then the executor or administrator represents the heirs and devisees, also the creditors of the deceased, and in the interest of all of them is bound to use all lawful means, by suit or otherwise, to preserve and protect the estate against all fraudulent claims by which the title or value of the property in his charge may be impaired. This duty devolves upon them from the very nature of their office, (*Meeks* v. *Vassault*, 3 Sawy. 213; *Cunningham* v. *Ashley*, 45 Cal. 485,) and is independent of the specific powers and duties prescribed by statute. In *Curtis* v. *Sutter*, 15 Cal. 264, a suit by an administrator to quiet the title of an intestate to real property was sustained by the supreme court of the state against the objection that it was improperly brought in his name. If a suit of that nature may be brought, it is not perceived, as counsel justly observes, why a suit *quia timet* may not be brought by an executor to cancel a forged paper, and, if so, why he may not file a bill of revivor to obtain the benefit of a decree rendered in favor of the deceased in a suit of that character. We have no doubt that whatever suit the deceased might have brought for the protection of his estate from unreasonable, illegal, and fraudulent claims, his executor may bring, and whatever judgments the deceased may have obtained for that protection, which the courts had jurisdiction to render, and which have not been fully enforced, his executor may have revived and enforced. The fact that the executor in his bill simply describes himself as the personal representative of the deceased, without averring that any property of the latter had come into his hands, is of no moment. The bill of revivor is to be read in connection with the record in the original suit, which declares that the deceased was possessed of a large property, real and personal; and it will be presumed that it came into the hands of his executor, where the law places it, in the absence of averments to the contrary. Besides, the only question which can be considered on this bill to revive is whether the plaintiff is executor of the deceased, and thus succeeds, by operation of law, to the charge of his property; and this fact is admitted by the demurrer. As said by Mr. Justice STORY, in *Slack* v. *Walcott*, 3 Mason, 508, 512:

"When a party plaintiff dies, whose interest is transmitted to some other person, if the title be that of mere representation in law, there is no change in the title itself; and the only question that arises is, who is the person entitled to take as representative?—that is, in respect to real estate, who is the heir? and in respect to personal estate, who is the executor or administrator? When this fact is ascertained, the person succeeds, by operation of law, to the whole title of the deceased. A bill of revivor in such case merely substitutes the representative in lieu of the deceased, and states no new fact as to title except that of transmission by operation of law. The title of representation or heirship, at least in a court of chancery, is not disputable; but the person in whom it is vested is alone to be ascertained."

The objection that the bill does not describe specifically the property of the deceased is without force. The fact appears in the record of the

original suit that the deceased possessed a large and valuable property, the right to portions of which would be affected by the alleged contract, if genuine and valid. But it is earnestly contended, both against the bill of revivor and against the original bill in the nature of a bill of revivor, that the suit in the circuit court abated by the transfer of the decedent's property under the deed of trust of November 4, 1885, and therefore the court could not proceed any further therein. Both of the bills have the same object,—to revive the original decree and enforce its execution; the latter being necessary because the trustees and beneficiaries under the trust deed take by a title which may be contested, and not like the executor by operation of law. As said in *Slack* v. *Walcott:*

"When a party plaintiff claims a title by purchase or devise, he introduces a new title not previously in the case, and which is controvertible, not merely by the defendants in the bill, but also by the heirs at law. As to these parties the suit is original. It does not merely revive the old suit, but it states new supplementary matters calling for an answer. So far, then, as it states such matter, it is an original bill; and so far as it seeks to revive upon that matter, it is in the nature of a bill of revivor."

But, as held in the same case, purchasers and devisees, by an original bill, in the nature of a bill of revivor, may draw to themselves the advantages of the former suit, in whatever stage it may be at the time of the abatement. To the alleged abatement of the original suit, by the transfer of the decedent's property, there are three answers, each of which is complete. In the first place, the reservations in the trust deed of power. in the grantor to claim during his life the payment of the net income, rents, issues, and profits of the property remaining after certain monthly payments to his children, and to his son-in-law for his grandchildren, continued in him sufficient interest in the property to maintain the suit to cancel a forged document which might lessen the amount of such income, rents, and profits. In the second place, the decree, having been entered as of September 29, 1885, was, with reference to the trust deed subsequently executed, as though the decree had been announced by the court as of that day. *Mitchell* v. *Overman*, 103 U. S. 62; *Borer* v. *Chapman*, 119 U. S. 596, 597, 7 Sup. Ct. Rep. 342. In the third place, the deed of trust having been made *pendente lite*, the trustee and beneficiaries took subject to the decree which might be subsequently rendered. The suit being to revoke and cancel an instrument which might otherwise lessen the value of the estate, and having been heard and submitted for decision, it is to be presumed, in the absence of any application by the trustee and beneficiaries to be substituted as plaintiffs, that they desired that the case should be held for such determination in their interest. While they might properly have asked to be joined with the plaintiff, they were not bound to do so. The court had jurisdiction to proceed without them to render the decree.

Having disposed of the objections to the jurisdiction of the circuit court of the United States in the original suit of *Sharon* v. *Hill*, we proceed to consider how far the judgment therein is affected, or should have been affected, if at all, by the judgment in the state court. William Sha-

ron, being a citizen of Nevada, had a constitutional right to ask the decision of the federal court upon the case presented by him, and it would be a strange result if the defendant, who was summoned there, could, by any subsequent proceedings elsewhere, oust that court of its jurisdiction and rightful authority to decide the case. The constitution declares that the judicial powers of the United States shall extend to controversies between citizens of different states,—a provision which had its origin in the impression that local attachments and prejudices might injuriously affect the administration of justice in the state courts against the claims of citizens of other states. *Railway Co.* v. *Whitton*, 13 Wall. 270, 289. So valuable has the right of citizens of other states than the one in which suits are brought against them to have their cases heard in a federal court always been regarded, that, at the very outset of the government, congress provided, and in different acts since has renewed the provision, that when a citizen of another state is sued in a state court, he may, upon proper application, accompanied by an offer of good and sufficient surety for entering copies of the proceedings and his appearance in the federal court, have the case removed to that court, and tried or heard there; and all the acts of congress have declared that it shall be the duty of the state court in such a case to accept the surety, and to proceed no further in the cause. Any subsequent proceedings there are null and void, and will be so treated by the federal courts. As said by the supreme court, in *Railroad Co.* v. *Koontz*, 104 U. S. 14, it is well settled that, "when a sufficient case for removal is made in the state court, the rightful jurisdiction of that court comes to an end, and no further proceedings can properly be had there, unless in some form its jurisdiction is restored." As congress has made such careful provision to secure to citizens of other states a right to transfer to a federal court cases in which they are sued in state courts, and prohibited further proceedings therein after proper application is made for removal, it would be strange, we repeat, if a defendant properly summoned in the first instance into that court by a citizen of another state could cut off and practically nullify the latter's constitutional right to a hearing there by instituting a suit in a state court, which might involve in some of its phases a determination of the same matters. Such a pretension, as said in one of the authorities cited, cannot be tolerated. The jurisdiction of the federal court having attached, the right of the plaintiff to prosecute his suit to a final determination there cannot be arrested, defeated, or impaired by any proceeding in a court of another jurisdiction. This doctrine we hold to be incontrovertible. It is essential to any orderly and decent administration of justice, and to prevent an unseemly conflict of authority, which could ultimately be determined only by superiority of physical force on one side or the other. In *Wallace* v. *McConnell*, 13 Pet. 143, we have a decision of the supreme court of the United States illustrative and confirmatory of this doctrine. That case was brought in the district court of the United States for the district of Alabama, exercising the powers of a circuit court, upon a promissory note of the defendant for $4,880. The defendant pleaded payment and satisfaction, and, issue being joined therein, the

case was continued until the succeeding term. The defendant then interposed a plea of *puis darrein continuance*, alleging that as to $4,204 of the sum demanded the plaintiff ought not further to maintain the action against him, because that sum had been attached in proceedings commenced against him under the attachment law of Alabama, in which he was summoned as garnishee. In those proceedings he had admitted his indebtedness beyond a certain payment made, and the state court gave judgment against him for the balance. To this plea the plaintiff demurred, and the demurrer was sustained. The case was ultimately taken to the supreme court, where it was contended that the proceedings under the attachment law of Alabama were sufficient to bar the action as to the amount of the sum attached, and that therefore the demurrer ought to have been overruled. But the court said:

"The plea shows that the proceedings on the attachment were instituted after the commencement of this suit. The jurisdiction of the district court of the United States, and the right of the plaintiff to prosecute his suit in that court, having attached, that right could not be arrested or taken away by any proceedings in another court. This would produce a collision in the jurisdiction of courts that would extremely embarrass the administration of justice."

In *Taylor* v. *Taintor*, 16 Wall. 370, the supreme court, speaking by Justice SWAYNE, said:

"Where a state court and a court of the United States may each take jurisdiction, the tribunal which first gets it holds it to the exclusion of the other until its duty is fully performed, and the jurisdiction invoked is exhausted; and this rule applies alike in both civil and criminal cases. It is, indeed, a principle of universal jurisprudence that where jurisdiction has attached to person or thing, it is, unless there is some provision to the contrary, exclusive in effect until it has wrought its function."

In *Shoemaker* v. *French*, Chase, 267, a bill was filed in the circuit court of the United States for the district of Virginia by the plaintiff, Shoemaker, for an injunction to prevent the defendant, French, from acting as president of the Alexandria & Washington Railroad Company, and an order was made directing that he be served with notice of motion for the injunction. After this, French filed a bill in a state court of Virginia, praying an injunction against Shoemaker for matters cognate to the bill in the circuit court; and Chief Justice CHASE, in granting the prayer of the bill in the circuit court, said:

"The jurisdiction of this court as to these matters attached when Shoemaker's bill was filed here, and the order passed by this court. Therefore the jurisdiction of the state court was ousted, or must be exercised in subordination to the jurisdiction of this court."

The doctrine that where different courts may entertain jurisdiction of the same subject, the court which first obtains jurisdiction will retain it to the end of the controversy, either to the entire exclusion of the other, or to the exclusion so far as to render the latter's decision subordinate to that of the other, prevails very generally, both in the federal and state courts, with some exceptions which we shall hereafter consider. Thus, in *Gaylord* v. *Railroad Co.*, a bill was filed in the circuit court of the United States for the district of Indiana to obtain, among other things,

the appointment of a receiver of the property of an insolvent corporation, and to administer it for the benefit of the creditors. After a demurrer to the bill had been sustained, and an amendment made, a receiver was appointed. While proceedings were thus pending in the federal court, a suit was commenced in a state court of Indiana, in which a receiver was also appointed, who took possession of the property. Subsequently the parties thus having possession surrendered the property to the receiver of the federal court, upon his application and the presentation of its order. He was thereupon arrested by the state court, but the federal court released him, and he retained the property, the court refusing to rescind the order appointing him. In disposing of the case, the federal court said:

"We think that there is no other safe rule to adopt, in our mixed system of state and federal jurisprudence, than to hold that the court which first obtains jurisdiction of the controversy, and thereby of the *res*, is entitled to retain it until the litigation is settled." 6 Biss. 286, 291.

In *Insurance Co.* v. *University* a bill was filed in a state court of Illinois to enjoin the foreclosure of a mortgage, and have it set aside and declared void. Later, on the same day, a bill was filed in the circuit court of the United States for the Northern district of Illinois to foreclose the mortgage. The process of the federal court was first served, preceding by a few hours the service of process from the state court, and it was held that the fact that process from the federal court was first served gave that court jurisdiction to go on with the foreclosure suit, and determine all questions as to the validity of the mortgage. In deciding the case, the court, speaking by Judge DRUMMOND, said:

"It is undoubtedly a very embarrassing state of litigation, there being two suits, brought in two jurisdictions, involving to a great extent the same subject-matter, and I have felt some difficulty in determining what is the true rule upon this subject; but I have come to the conclusion that it must be this: That this court has a right to go on, as I have already said, and decide all questions which legitimately flow out of the subject-matter of controversy in this case, namely, those affecting the existence of the mortgage and the right of the University of Chicago to make it, so as to reach a decree, if the case warrants it, which shall be conclusive upon the University of Chicago; that is to say, which shall prevent that corporation from ever setting up any claim or right to this property, or any claim whatever that it had not the right to execute this mortgage." 10 Biss. 191, 195, 6 Fed. Rep. 443.

In *Mason* v. *Piggott*, in the supreme court of Illinois, it appeared that the defendant, instead of making a defense in an action pending in a court of law, had attempted to transfer the case to a court of equity, and the court said:

"It by no means follows, because a court of equity has concurrent jurisdiction with a court of law, that it will take cognizance of a case already pending in a court of law, and oust it of jurisdiction. As a general principle, in all cases of concurrent jurisdiction, the tribunal which first obtains jurisdiction of the subject-matter must proceed and finally dispose of it. A court of equity will not take jurisdiction where it has first been acquired by a court of law, unless there is some equitable circumstance in the case which the party cannot

avail himself of at law. Subject to this qualification, the rule is inflexible." 11 Ill. 88.

In *Bank* v. *Railroad Co.*, in the supreme court of Vermont, it appeared that the defendant, in an action at law pending against him in Massachusetts, had filed his bill in a Vermont court of chancery to enjoin the action. The bill was dismissed, and the court, admitting the power of a court of equity to enjoin parties within its jurisdiction from proceeding in a court of law in another state, said:

"We hold it to be a sound rule of law, based upon the most salutary principle, that in all cases of concurrent jurisdiction the court that has first possession of the matter should be left to decide it, unless there exists some peculiar equitable ground for withdrawing a controversy from a court of law to a court of chancery, and which disenables the party having the law in his favor from bringing his case fairly and fully before a court of law. This principle is founded upon the courtesy which courts of concurrent jurisdiction should exercise towards each other, and may be necessary, as matter of policy, to prevent a conflict in the action of different courts." 28 Vt. 470–477.

In *Stearns* v. *Stearns*, in the supreme court of Massachusetts, a decree of the probate court appointing commissioners to make partition of an estate among the heirs was reversed, because proceedings were first commenced for that purpose in another court of concurrent jurisdiction against the parties moving the decree, which proceedings were pending when the decree was rendered; the court saying that "when different courts have concurrent jurisdiction, the one before whom proceedings may be first had, and whose jurisdiction first attaches, must necessarily have authority paramount to the other courts; or, rather, the action first commenced shall not be abated by an action commenced between the same parties in relation to the same subject, in the same or any other court." 16 Mass. 170. The case of *Insurance Co.* v. *Howell*, in the court of chancery of New Jersey, presents some features similar to the case at bar. The complainant filed its bill for relief against two policies of insurance which it alleged the defendant had fraudulently obtained from it upon his property in Illinois. The bill prayed that the policies might be delivered up and canceled or declared invalid, and that the defendant might be perpetually enjoined from bringing any suit at law or equity upon them, or making use of them in any way for the purpose of establishing any claim or damage against the complainant. The defendant appeared and filed an answer, to which, a replication being made, proofs were taken. After the suit was commenced, the defendant brought an action at law upon the policies against the company in a state court of Illinois, which suit was on its petition removed into the circuit court of the United States for the Northern district of Illinois. The company thereupon filed its petition in the court of New Jersey for an injunction to restrain him from prosecuting the suit in Illinois. An injunction having been issued, a motion was made to dissolve it. In denying the motion, the chancellor said:

"This court having the power to hear and determine the subject-matter in controversy, and having first obtained possession of the controversy, is fully at liberty to retain it until it shall have disposed of it. The general rule is

that, as between courts of concurrent and co-ordinate jurisdiction, (and the circuit court of the United States and the state courts are such in certain controversies, such as that involved in this suit, for example, between citizens of different states,) the court that first obtains possession of the controversy must be allowed to dispose of it without interference from the co-ordinate court. * * * Where a party is within the jurisdiction of this court, so that on a bill properly filed here this court has jurisdiction of his person, although the subject-matter of the suit may be situated elsewhere, it may, by the ordinary process of injunction and attachment for contempt, compel him to desist from commencing a suit at law, either in this state or any foreign jurisdiction, and of course from prosecuting one commenced after the bringing of the suit in this court." 24 N. J. Eq. 239.

In *Brooks* v. *Delaplaine* the high court of chancery of Maryland dismissed a bill in equity because at the time it was filed a suit involving the same controversy was pending in the county court having concurrent jurisdiction, the chancellor saying:

"When two courts have concurrent jurisdiction over the same subject-matter, the court in which the suit is first commenced is entitled to retain it. This rule would seem to be vital to the harmonious movement of courts whose powers may be exerted within the same spheres, and over the same subjects and persons. * * * Any other rule will unavoidably lead to perpetual collision, and be productive of the most calamitous results." 1 Md. Ch. 354.

Similar decisions might be cited from the highest courts of nearly every state; for upon the principle stated there is, with certain well-recognized exceptions, a general concurrence of opinion. Where two judgments, relating to the same subject, are irreconcilable, both cannot be enforced. One or the other must give way, and the only reasonable test by which the superiority of one over the other is to be determined is that which is expressed in the authorities cited, that the court which first obtains jurisdiction of the subject and parties must have the right to proceed to judgment. Having first acquired possession of the subject, it cannot be rightly ousted by subsequent proceedings in another court having no supervising or appellate authority. If the time of the rendition of the judgment, independently of the commencement of the suit, were to be the test, the superiority of judgment, as counsel well observe, would depend on mere accident or circumstances beyond the power of the court or parties; as one court may have a large calendar, and be blocked up with business, creating great delay in the disposition of causes, while the other court may have few causes, and those of minor importance, and thus be enabled to speedily dispose of them. It would give the latter court pre-eminence, because it is enabled, from paucity of cases, to dispose of its calendar at an earlier day, and might, as suggested, tend to an unseemly scramble of litigants to speed cases in the respective courts of their preference. The exceptions to the doctrine that priority of jurisdiction controls priority of decision, to which we have referred, and to which our attention has been called by counsel of the defendants, will be found on examination to range themselves under two classes: *First,* where the same plaintiff has asked in the different suits a determination of the same matter; as, for instance, where different obligations are issued upon the same transaction, which is attacked in each suit as fraudulent

and illegal, and therefore vitiating the several obligations; or where the jurisdiction of a court of equity, as well as a court of law, is invoked by him with reference to the matter. Of course a decision first rendered in either suit may be pleaded in the others. The plaintiff must abide the adjudication which he has sought. And, *second*, where the cases are upon contracts or obligations, which from their nature are merged in the judgment rendered, the subject upon which the first suit is founded having thus ceased to exist. The cases of *Duffy* v. *Lytle*, 5 Watts, 120; *Rogers* v. *Odell*, 39 N. H. 452; *Child* v. *Powder Works*, 45 N. H. 547; *Bank* v. *Bank*, 7 Gill, 415; and *Westcott* v. *Edmunds*, 68 Pa. St. 34,—fall under one or the other of these classes. The language quoted from *Buck* v. *Colbath*, 3 Wall. 345, was used as explanatory of the general doctrine that, in examining into the exclusive character of the jurisdiction of a court, we must have regard to the nature of the remedies, the character of the relief sought, and the identity of the parties in the different suits. The illustration given of a party suing in a court of chancery to foreclose his mortgage, and in a court of law to recover judgment on his notes, and in another court of law, in an action of ejectment, to recover the possession of the land, would have brought the supposed case, if a real one, under the first class of exceptions stated above, where a decree first rendered in either suit upon the same point could have been pleaded as conclusive in the others. In the *Tubal Cain Case*, 9 Fed. Rep. 834, the judgment of the state court pleaded in the United States district court was recovered in the prior action, and the circuit court stayed its proceedings to await the determination of an appeal from the judgment. The other authorities cited do not seem to us, after careful consideration, to be entitled to any weight upon the question presented.

The case at bar is not within either of the excepted classes. The plaintiff has not invoked the jurisdiction of the state court, and the alleged marriage contract is not one which in any sense of the rule was merged or could be merged in the judgment, any more than a deed, upon which title to real estate is asserted, is merged in a judgment in ejectment for the possession of the property. It was as much an outstanding and existing contract after the judgment of the state court as before, and was equally available for all purposes. But, aside from this, the doctrine of the excepted cases can have no application to cases instituted in a federal court by a citizen of another state, so as to give paramount authority to a judgment of a state court in a suit subsequently commenced against him, without defeating a most important right conferred upon him by the constitution and laws of the United States,—a result which can in no manner be accomplished either directly or indirectly. See *Suydam* v. *Broadnax*, 14 Pet. 67, and *Payne* v. *Hook*, 7 Wall. 430. It is true that, in the decision of the case, Judge DEADY expressed his opinion to the effect that, as the validity and genuineness of the declaration of marriage were invoked in the state court, its determination would be conclusive, and estop the plaintiff in this court to show the contrary, if it had not been obviated by the appeal from the judgment. We do not concur with the learned judge in this view, for reasons already stated;

but, assuming it to be sound, we agree with him that the effect of the appeal was to prevent the judgment from becoming final, and to destroy its efficacy as evidence. By the act of congress the judgment could only have such faith and credit given to it as it has by law or usage in the courts of the state; and by the law of the state its operation as evidence is superseded by an appeal. The Code of Civil Procedure provides that when an appeal is perfected "it stays all further proceedings in the court below, upon the judgment or order appealed from, or upon the matters embraced therein;" and also that "an action is deemed to be pending from the time of its commencement until its final determination upon appeal, or until the time for appeal has passed, unless the judgment is sooner satisfied." Such is the express language of the Code, (sections 946, 1049,) and, as the district judge observes, these provisions are in conformity with the law previously existing, according to which an appeal not only stayed the execution of a judgment, but suspended its operation for all purposes. Thus, in *Woodbury* v. *Bowman*, 13 Cal. 635, which was decided before the adoption of the Code, the record of a judgment from which an appeal was pending was offered in evidence, and rejected, and the court, in affirming the ruling, said:

"We think it was properly rejected; the appeal having suspended the operation of the judgment for all purposes, it was not evidence in the questions at issue, even between the parties to it."

And in *Murray* v. *Green*, 64 Cal. 369, decided since the adoption of the Code, the record of a judgment in a case then on appeal was offered in evidence, and rejected; and the court, in sustaining the decision, said that while the appeal was pending "the operation of that judgment for all purposes was suspended, and it was not admissible in evidence in any controversy between the parties." The circuit judge did not concur with the district judge as to what would be the effect of the judgment in the state court, if it were final, observing that it was unnecessary to determine that question, and that he reserved his opinion upon it until it should properly arise for judicial determination, and until an opportunity was had for its full discussion and mature consideration. But the circuit judge did concur with the district judge as to the effect of the appeal in destroying the judgment of the state court as evidence of any kind in the federal court. It was of no avail, therefore, when pleaded as an estoppel. It was not evidence of the truth of the matters found, much less conclusive evidence. The ruling of the circuit court in refusing its consideration was therefore correct at the time; and if correct then, it could not become erroneous by any subsequent event. The affirmance of the judgment since has no retroactive operation so as to make that ruling bad which was then sound. But, more than this, there is still pending an appeal to the supreme court from an order refusing a new trial in the state court. The judgment therein has not, therefore, even yet become final. It does not yet establish, as between the parties, the verity of the findings. In the recent case of *Gillmore* v. *Insurance Co.*, in the supreme court of this state, (65 Cal. 63, 66, 2 Pac. Rep. 882,) the effect of a pending motion for a new trial upon the finality of a judgment

was considered. There a stipulation had been made that all proceedings should be stayed until final judgment and decision in another action. It was contended that the judgment in that action had become final, within the meaning of the stipulation, after a year had elapsed from its entry without an appeal being taken from it. There was pending a motion for a new trial, and the court said:

"Although no appeal had been taken from the judgment within the statutory time, proceedings were pending, upon a motion made by the defendant in the case, to vacate the judgment, and grant a new trial. That motion subjected the judgment to be reviewed, and made it liable to be set aside. The judgment was therefore not final, in the sense of the stipulation as to the right of the parties affected by it, and could not become so until the motion for a new trial had been disposed of. *Hills* v. *Sherwood,* 33 Cal. 474. While proceedings are pending for the review of a judgment, either on appeal or motion for a new trial, the litigation on the merits of the case between the parties is not ended, and until litigation on the merits is ended there is no finality to the judgment, in the sense of a final determination of the rights of the parties, although it has become final for the purpose of an appeal from it."

See, also, *Fulton* v. *Hanna,* 40 Cal. 278.

It remains to consider the further objections of the defendants that the priority of jurisdiction of the federal court was waived by the stipulation to remand the case originally commenced in the state court, from the federal court to which it had been removed, back to the state court; that the failure to present to the state court the judgment of the federal court was an abandonment of its protection; and that the execution of the decree in the federal court by injunction against prosecuting proceedings under the judgment of the state court is forbidden by the act of congress prohibiting the issue of an injunction to stay proceedings in a state court except in cases of bankruptcy. Rev. St. § 720. The alleged waiver of priority of jurisdiction by the federal court because of the consent of parties to remand the case commenced in the state court back to it, after its removal, was considered on the argument in the original suit, and held to be without force. A statement of the circumstances of the remanding is sufficient answer to the position. The case commenced in the state court by the alleged wife, Sarah Althea, against Sharon, praying that her alleged marriage be declared legal and valid, and then that a divorce be decreed, was removed on the application of the defendant therein to the federal court on the supposition that he had a right to have it heard there. The plaintiff therein denied that right on the ground that the subject-matter, being an action for a divorce, was not within the jurisdiction of the court, and moved to remand it back to the state court. The defendant's counsel appears to have come to the conclusion that her motion would be granted, and, instead of waiting for the order of the federal court to that effect, consented that the case might be remanded, and that is all there is of the alleged waiver. The consent waived no rights of priority by the original suit, nor in any respect affected its position. It would be strange if the remanding of one action by consent should change or affect in any degree the jurisdiction of the court over another and different action, to which the consent made no

reference. The position that the protection of the decree of the federal court was waived because the attention of the state court was not called to it, either on the motion for a new trial, or on the argument of the appeal in the supreme court, merits careful consideration. There is not, and certainly ought not to be, anything so unseemly as rivalry and contention between the courts of the state and the courts of the United States. Both have large and responsible duties in the administration of justice for the American people, and we are sure that neither has any desire to encroach upon the jurisdiction and rightful authority of the other. And yet, as both courts have on many subjects concurrent jurisdiction, it will sometimes happen that there will be a conflict of decision between them, and then a proper respect for each other will induce both to seek a solution consistent with the just rights of the parties. We think, therefore, it would have been a proper proceeding for the plaintiff in the original suit—the defendant in the state court—to have called the attention of that court and of the supreme court of the state in some formal way to the decision and decree of the federal court, not for the purpose of changing any alleged rulings had in the state courts, but in order to secure a stay therein of all further proceedings in them. The whole controversy in the state court rested upon the alleged validity of the marriage contract, and this fact is fully set forth in its findings. The decree in the federal court adjudged that contract to be a forgery, and ordered its surrender and cancellation. If this decree be a final one, and the court had jurisdiction to render it, there can be no doubt that it should, when presented to the state courts, stay all proceedings therein. Those courts would only be called upon to give full faith and credit to it, not to reverse or review any of their rulings, but to act upon a fact, conclusive of the case, for the first time brought to their attention. They would only be called upon to do what they would do upon official notice to them of any other fact which would conclude a pending controversy. If, for example, there should be brought to a *nisi prius* court, after a conviction of an accused party of murder, or before the supreme court of the state on appeal from the judgment, official notice that the convict had been pardoned subsequent to the conviction, the *nisi prius* court, would not thereupon grant a new trial, or the supreme court reverse the judgment, but both courts might properly be called upon to stay all proceedings upon the conviction; and an order to that effect, reciting the pardon, might be made. So, too, if, while argument is going on upon the appeal, the supposed murdered man should walk into court and present himself, I think the court, though it might find no error in the ruling of the lower court, would readily find a way to stay execution of the judgment upon reciting the personal appearance of the supposed murdered man. So we think the decree of the federal court might have been officially presented to the state courts, and a stay of proceedings in the action there asked. But it was not obligatory upon the defendant in the state courts to present to them the federal decree. He might think proper to await the final action of those courts, and, if the judgment of the superior court should be ultimately sustained, present the federal decree to stay its enforcement. He might

very well have deemed it wise to wait until the time to appeal from the federal decree had expired before calling upon the state courts to give effect to it in proceedings before them. The time to appeal did not expire until the 15th of January, 1888, after the motion for a new trial had been heard in the lower court, and the appeal had been heard and submitted in the supreme court. The decree was entered as of September 29, 1885, and was as effectual for all purposes as if it had been announced on that day, except where the rights of others may have been prejudiced thereby; and to prevent such·prejudice in shortening the time to appeal, it must be deemed to have commenced running only from the date of its actual entry. There was no effective appeal from the decree in the federal court taken during the statutory period. There was an attempt by the defendant to appeal, and an order was made allowing an appeal, but as this was before the case was revived the order was improvidently made, and was without any efficacy. Where a suit has abated by the death of the plaintiff after judgment, no appeal can be taken by the defendant until the case is revived. McClane v. Boon, 6 Wall. 244. The decree of the federal court, when revived, may be used to stay any attempted enforcement of the judgment of the state court. The case of Boynton v. Ball, 121 U. S. 462, 7 Sup. Ct. Rep. 981, is illustrative of this doctrine, and has a direct bearing upon the question. There a party, who had filed a petition for the benefit of the bankrupt law, was sued for a debt in a state court of Illinois. Although he could have applied, under the act of congress, to the state court for a stay of proceedings until the disposition of his petition in bankruptcy, he made no application of. the kind, and judgment passed against him there. When he subsequently obtained his discharge in bankruptcy, he presented it to that·court, and moved for a perpetual stay of execution on its judgment. The motion was denied, and the supreme court of the state affirmed the ruling. The case was then taken on· writ of error to the supreme court of the United States, where the judgment of the supreme court of Illinois was reversed. After citing the section of the bankrupt act giving the right of the party to stay proceedings in the state courts, the supreme court of the United States said:

"The whole section is also clearly impressed with the idea that this is a provision primarily for the benefit of the bankrupt, that he may be enabled to avoid being harassed in both courts at the same time with regard to such debt. It is therefore a right 'which he may waive. He may be willing that the suit shall proceed in the state court for many reasons: First, because he is not sure that he will ever obtain his discharge from the court in bankruptcy, in which case it would do him no good to delay the proceedings at his expense in the ·state court; in the second place, he may have a defense in the state ·court which he is .quite willing to rely upon there, and to have the issue tried; in the third place, he may be very willing to have the amount in dispute liq·uidated in that proceeding, in which case it becomes a debt to be paid pro rata · with his other debts by the assignee in bankruptcy. If, for any of these rea-.sons, or for others, he permits the case to proceed to judgment in the state ,court, ·by failing to procure a stay of proceedings under the provisions of this . section of the bankrupt law, or the assignee in bankruptcy does not intervene, ·:as he may do,—Hill v. Harding, 107 U. S. 631, [2 Sup. Ct. Rep. 404,]—he

does not thereby forfeit his right to plead his final discharge in bankruptcy, if he shall obtain it at any appropriate stage of the proceedings against him in the state court. And if, as in the present case, his final discharge is not obtained until after judgment has been rendered against him in the state court, he may produce that discharge to the state court, and obtain the stay of execution which he asks for now."

The failure to present the decree to the state courts did not, therefore, in our opinion, lessen its efficacy, and will not prevent it when revived from being hereafter presented to them, and does not impair in any respect the power of this court to enforce its execution. The prohibition against the issue of an injunction by a court of the United States to stay proceedings in a state court is found in section 5 of the act of March 2, 1793, (1 St. 334,) and has been continued in force ever since. It is now contained in section 720 of the Revised Statutes, with an exception relating to proceedings in bankruptcy, and is as follows:

"The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a state, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy."

Notwithstanding the very general terms of the prohibition, with the single exception mentioned, it has been settled that it does not apply where the federal court has first obtained jurisdiction, or where, the state court having first obtained jurisdiction, the case has been removed to the federal court. In such cases the federal court may restrain all proceedings in a state court which would have the effect of defeating or impairing its jurisdiction. It extends only to cases in which the jurisdiction of the state court has first attached. With its proceedings, then, no federal court can interfere by injunction. In *Fisk* v. *Railroad Co.*, 10 Blatchf. 520, the circuit court of the United States for the Southern district of New York issued an injunction restraining that corporation from taking any steps in a state court to procure its own dissolution, and the effect of the statute in question was considered. Judge BLATCH-FORD, now one of the justices of the supreme court, in deciding the case, said:

"The provision of section 5 of the act of March 2, 1793, (1 U. S. St. at Large, 334, 335,) that a writ of injunction shall not be granted to stay proceedings in any court of a state, has never been held to have, and cannot properly be construed to have, any application except to proceedings commenced in a court of a state before the proceedings are commenced in a federal court. Otherwise, after suit brought in a federal court, a party defendant could, by resorting to a suit in a state court, defeat, in many ways, the effective jurisdiction and action of the federal court, after it had obtained full jurisdiction of person and subject-matter. Moreover, the provision of the act of 1793 must be construed in connection with the provision of section 14 of the act of September 24, 1789, (1 U. S. St. at Large, 81, 82,) that the federal courts shall have power to issue all writs which may be necessary for the exercise of their respective jurisdictions. It may properly be considered as necessary for the continued exercise of the jurisdiction of this court over the corporation in question that it should be restrained from taking steps in a state court to put itself out of existence."

In *Wagner* v. *Drake*, in the circuit court of the United States for the district of Iowa, (31 Fed. Rep. 851,) the question raised was as to the power of the court to restrain proceedings in a state court, after the action had been removed to it, and, though it was held that the facts of the particular case did not authorize the injunction, the power of the federal court to restrain such proceedings where irreparable injury would follow a refusal of the writ was fully recognized. In deciding the case, the court said:

"An injunction, in such case, by the federal court, restraining the parties before it from proceeding elsewhere, is no injunction, within the spirit and intent of the statute staying proceedings in a state court, because, after removal, there is no proceeding left in the state court, and no jurisdiction to be interfered with. If, after removal, a party could continue or renew his litigation in the state court, the whole purpose of the removal might be defeated."

The doctrine of these cases has been affirmed by the supreme court of the United States. In *French* v. *Hay*, 22 Wall. 250, that court held that the circuit court of the United States for the Eastern district of Virginia rightfully enjoined proceedings in a suit in a court of Pennsylvania, founded upon a decree rendered in a suit in a court of Virginia, which had been properly removed to the circuit court. In deciding the case, the supreme court, speaking by Mr. Justice SWAYNE, said:

"The prohibition in the judiciary act against the granting of injunctions by the courts of the United States touching proceedings in state courts has no application here. The prior jurisdiction of the court below took the case out of the operation of that provision."

In *Dietzsch* v. *Huidekoper*, 103 U. S. 494, it appeared that an action of replevin had been commenced in a state court of Illinois, which was removed to the circuit court of the United States for that district. Notwithstanding the removal, a writ for the return of the property was issued by the state court, which the plaintiffs in the replevin suit refused to obey. An action was then brought against them and their sureties on the replevin bond. They thereupon filed a bill in the United States circuit court, in which they prayed an injunction to restrain the prosecution of any suit upon the bond. An injunction was issued, and the supreme court held that it was properly granted, observing that "a court of the United States is not prevented from enforcing its own judgments by the statute which forbids it to grant a writ of injunction to stay proceedings in a state court." It is essential to the due administration of justice in the federal courts that they have full power to issue all process necessary for the exercise of their jurisdiction, and such power is in explicit terms conferred by statute upon them. When, therefore, jurisdiction over a subject-matter has first attached in a federal court, it must be able to issue all such orders and process as may be essential to give effect to that jurisdiction. State courts, subsequently taking jurisdiction over the same subject, must exercise it in subordination to the determination of the federal court.

We have thus gone over, with as much care as we have been able to give, the several objections of counsel to the jurisdiction of the circuit court of the United States to render the decree in the original suit of *Sharon* v. *Hill*, and we have no doubt of its complete and paramount jurisdiction over the subject-matter of the suit, and to render the decree entered. That decree was reached after an exhaustive examination of the proofs in the case, as shown by the elaborate opinions of the judges. Although there are some doctrines announced in the leading opinion to which we do not assent, and to one of which we have already referred, no one, we think, with a clear judgment, unaffected by passion, can read and study its masterly analysis and presentation of the testimony without being convinced that the court had abundant reasons for its conclusions. The learned counsel for the defendants for once, contrary to his general habit, has been led by his zeal beyond the limits of proper discussion in declaring to the court which rendered the decree that it is "an ineffective, inoperative, unenforceable *pronunciamiento*." Being, upon the matters embraced by it, in our judgment, binding and conclusive, it must be enforced in all its parts until the only tribunal in this country which can control and stay it—the supreme court of the United States— has determined otherwise. That tribunal is lifted far above all prejudices, passions, and attachments, and will adjudge without any such influences what is just and right in the controversy, so far as that is attainable in our system of government. We have endeavored to discuss the questions presented purely as legal questions, without reference to or comment upon the evidence in the cases; yet, as counsel have referred to the different manner in which the testimony was given in the two courts,—that in the state court by the witnesses in open court, and that in the federal court by depositions before an examiner in chancery,—as though for this reason the conclusions of the state court were entitled to greater consideration than those of the federal court, we have read with care the opinion of the state court. The testimony is such that weight is to be attached to it more from its character and intrinsic nature than from the manner in which it was given. The great question in both was the genuineness of the alleged marriage contract; the holder, Sarah Althea, affirming its genuineness, and the alleged signer, William Sharon, asseverating its forgery. Both have accompanied their statements with their oaths. Both have not testified to the truth. There is falsehood on one side or the other. The burden of proof was on her, and the learned judge of the state court often speaks of testimony offered by her in terms of condemnation. In one passage he says of certain testimony given by her:

"This is unimportant, except that it shows a disposition, which crops out occasionally in her testimony, to misstate or deny facts when she deems it of advantage to her case."

Again, with respect to alleged introductions of her to several persons as the wife of Sharon, the judge says:

"Plaintiff's testimony as to these occasions is directly contradicted, and in my judgment her testimony as to these matters is willfully false."

As to her testimony that she advanced to Sharon in the early part of her acquaintance $7,500, the judge says:

"This claim, in my judgment, is utterly unfounded. No such advance was ever made."

Again the court said:

"The plaintiff claims that the defendant wrote her notes at different times after her expulsion from the Grand Hotel. If such notes were written, it seems strange that they have not been preserved and produced in evidence. I do not believe she received any such notes."

Again, a document purporting to be signed by Sharon was produced by her, explaining why she was sent from the Grand Hotel in the fall of 1881, and also acknowledging that the money he was then paying her was part of $7,500 she had placed in his hands. The production of the paper for inspection was vigorously resisted, but it was finally produced. At a subsequent period, when called for, it could not be found. Of this paper the judge said:

"Among the objections suggested to this paper, as appearing on its face, was one made by counsel that the signature was evidently a forgery. The matters recited in the paper are, in my judgment, at variance with the facts which it purports to recite. Considering the stubborn manner in which the production of this paper was at first resisted, and the mysterious manner of its disappearance, I am inclined to regard it in the light of one of the fabrications constructed for the purpose of bolstering up plaintiff's case. I can view the paper in no other light than as a fabrication."

There are several other equally significant and pointed passages expressive of the character of the testimony produced in support of her case. Of what she attempted, the judge thus speaks:

"I am of the opinion that to some extent plaintiff has availed herself of the aid of false testimony for the purpose of giving her case a better appearance in the eyes of the court; but sometimes parties have been known to resort to false testimony where, in their judgment, it would assist them in prosecuting a lawful claim. As I understand the facts of this case, that was done in this instance."

Notwithstanding this characterization of parts of her testimony, the genuineness of the alleged marriage contract rests to a great extent upon her testimony. It would seem that the learned judge reached his conclusions without due regard to a principle in the weighing of testimony, as old as the hills, and which ought to be as eternal in the administration of justice, that the presentation knowingly of fabricated papers or false evidence, to sustain the story of a party, throws discredit upon his whole statement. It is generally deemed equivalent to an admission of the falsity of the whole claim. *Deering* v. *Metcalf*, 74 N. Y. 501, 506; *Railway Co.* v. *McMahon*, 103 Ill. 485; *Egan* v. *Bowker*, 5 Allen, 449; Code Civil Proc. § 2061; Starkie, Ev. 873. We have referred to the opinion of the state judge merely on account of the claim that his conclusions, because he had the witnesses before him, and because of the alleged defective machinery for taking testimony in the federal courts, are entitled to more consideration than the opposite conclusions reached by the federal judges after a most thorough and exhaustive examination.

The judgment of this court is that the demurrers in both cases be over-ruled; that in the first case the original suit of William Sharon against Sarah Althea Hill, now Sarah Althea Terry, and the proceedings and final decree therein, stand revived in the name of Frederick W. Sharon, as executor, and against Sarah Althea Terry and David S. Terry, her husband; the said executor being substituted as plaintiff in the place of William Sharon, deceased, and the said David S. Terry being joined as defendant with his wife, so as to give to the said plaintiff, executor as aforesaid, the full benefit, rights, and protection of said final decree, and full power to enforce the same against the said defendants, at all times, and in all places, and in all particulars. In the second case, that of Francis G. Newlands, trustee, and others, beneficiaries under the trust deed, the defendants will have leave to answer until the next rule-day. Appropriate orders in conformity with this decision will be entered in the respective cases.