TOUCEY v. NEW YORK LIFE INSURANCE CO.*

No. 16. Reargued October 17, 1941.—Decided November 17, 1941.

*Samuel R. Toucey* submitted, *pro se.*

*Mr. Richard S. Righter,* with whom *Messrs. Samuel W. Sawyer* and *Horace F. Blackwell, Jr.* were on the brief, for respondent in No. 16.

*Together with No. 19, *Phoenix Finance Corp.* v. *Iowa-Wisconsin Bridge Co.,* also on writ of certiorari, 312 U. S. 670, to the Circuit Court of Appeals for the Eighth Circuit—argued March 13, 1941, reargued October 17, 20, 1941.

120

124

*Mr. James R. Morford,* with whom *Mr. Casper Schenk* was on the brief, for petitioner in No. 19.

*Mr. Fred A. Ontjes,* with whom *Mr. Wm. C. Green* was on the brief, for respondent in No. 19.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

These cases were argued in succession and are dealt with in a single opinion because the controlling question in both is the same: Does a federal court have power to stay a proceeding in a state court simply because the claim in controversy has previously been adjudicated in the federal court?

*No. 16.* In 1935, Toucey brought suit against the New York Life Insurance Company in a Missouri state court. He alleged that in 1924 the company issued him a life insurance policy providing for monthly disability benefits and for the waiver of premiums during disability; that he became disabled in April, 1933, and that the defendant fraudulently concealed the disability provisions from him; that the defendant unlawfully cancelled the policy for nonpayment of premiums; that in September, 1935, he discovered the existence of the disability provisions; that he then applied to the company for reinstatement of the policy and for the payment of disability benefits, and that the company refused.

The suit was removed to the federal District Court for the Western District of Missouri, the plaintiff being a citizen of Missouri, the defendant a New York corporation, and the amount in controversy exceeding $3,000. All of the material allegations of the bill were denied. The district court dismissed the bill, finding that there was no fraud on the defendant's part and that the plaintiff was not disabled within the meaning of the policy. No appeal was taken.

In 1937, an action at law was brought against the insurance company in the Missouri state court by one Shay, a resident of the District of Columbia. He alleged that he was Toucey's assignee and that Toucey's disability entitled him to judgment. It does not appear that the insurance company filed an answer or any other pleading. Instead, a "supplemental bill" was filed in the Western District of Missouri, setting forth the history of the litigation between the parties, alleging that the assignment to Shay was made in order to avoid federal jurisdiction, and praying that Toucey be enjoined from bringing any suit for the purpose of readjudicating the issues settled by the federal decree and from further prosecuting the Shay suit.

A preliminary injunction was granted, and affirmed by the Circuit Court of Appeals for the Eighth Circuit. 102 F. 2d 16. The court held that Toucey's claim in the prior suit rested upon proof of his disability, and that this issue, necessarily involved in the Shay proceeding, had been conclusively determined in the insurance company's favor. Section 265 of the Judicial Code, 36 Stat. 1162, 28 U. S. C. § 379, was construed not to deprive a federal court of the power to enjoin state court proceedings where an injunction is "necessary to preserve to litigants the fruits of, or to effectuate the lawful decrees of the federal courts." Certiorari was denied, 307 U. S. 638, and the injunction was made permanent. Toucey

appealed and the Circuit Court of Appeals again affirmed, 112 F. 2d 927. In view of the importance of the questions presented, we granted certiorari. 311 U. S. 643. The decision below was affirmed by an equally divided Court, 313 U. S. 538, and the case is now before us on rehearing, 313 U. S. 596.

*No. 19.* The Iowa-Wisconsin Bridge Company, a Delaware corporation, in 1932 executed a deed of trust conveying all of its property, principally a bridge across the Mississippi River between Iowa and Wisconsin, to secure a $200,000 bond issue. In 1933, the trustees, an Iowa corporation and a Wisconsin citizen, filed a bill of foreclosure in the federal District Court for the Northern District of Iowa. One of the Bridge Company's stockholders intervened as a party defendant, alleging that the bonds and mortgage were fraudulent and without consideration. Upon his motion, the Phoenix Finance Corporation, a Delaware corporation which held almost 90% of the bonds, was joined as a plaintiff. The Bridge Company's answer challenged the validity of the indenture and alleged that the bonds were issued without consideration. Phoenix denied all allegations of fraud.

The case was tried before a master, whose modified conclusions were adopted by the court. Finding that the mortgage and bonds were fraudulently issued and that almost all the bonds were without consideration, the court denied foreclosure. The Circuit Court of Appeals for the Eighth Circuit affirmed, 98 F. 2d 416, and certiorari was denied, 305 U. S. 650.

Phoenix thereafter instituted five separate suits against the Bridge Company in the Delaware state courts, seeking recovery on various notes and contracts claimed to have constituted the consideration for the bonds. The Bridge Company thereupon filed a "supplemental bill" in the Northern District of Iowa, asserting that the issues involved in the state court suits had been made *res*

*judicata* by the federal decree, and praying, *inter alia,* that Phoenix be enjoined from further prosecuting the state suits. (In one of the suits, the state court rejected the *res judicata* plea, *Phoenix Finance Corp.* v. *Iowa-Wisconsin Bridge Co.,* 40 Del. 500, 14 A. 2d 386, and an appeal is now pending in the Supreme Court of Delaware.) The district court found that Phoenix was bound by the former decree, and that the prohibition of § 265 was no bar to an injunction. The Circuit Court of Appeals affirmed, 115 F. 2d 1, and because of the relation of the questions presented to those in No. 16, we brought the case here. 312 U. S. 670.

The courts below have thus decided that the previous federal judgments are *res judicata* in the state proceedings, and that therefore, notwithstanding the prohibitory provisions of § 265, the federal courts may use their injunctive powers to save the defendants in the state proceedings the inconvenience of pleading and proving *res judicata.*[1]

*First.* Section 265—"a limitation of the power of the federal courts dating almost from the beginning of our history and expressing an important Congressional policy—to prevent needless friction between state and federal courts," *Oklahoma Packing Co.* v. *Gas Co.,* 309 U. S. 4, 8–9—is derived from § 5 of the Act of March 2, 1793, 1 Stat. 335: ". . . nor shall a writ of injunction be granted [by any court of the United States] to stay proceedings in any court of a state . . ." In its present form, 36 Stat. 1162, 28 U. S. C. § 379, the provision reads as follows: "The writ of injunction shall not be

---

[1] Pleading a federal decree as *res judicata* in a state suit raises a federal question reviewable in this Court under § 237 (b) of the Judicial Code, 43 Stat. 937, 28 U. S. C. § 344 (b). *Dupasseur* v. *Rochereau,* 21 Wall. 130; *Deposit Bank* v. *Frankfort,* 191 U. S. 499; *Virginia-Carolina Chemical Co.* v. *Kirven,* 215 U. S. 252; *Stoll* v. *Gottlieb,* 305 U. S. 165, 167.

granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy." [2]

The history of this provision in the Judiciary Act of 1793 is not fully known. We know that on December 31, 1790, Attorney General Edmund Randolph reported to the House of Representatives on desirable changes in the Judiciary Act of 1789. Am. State Papers, Misc., vol. 1, No. 17, pp. 21–36. The most serious question raised by Randolph concerned the arduousness of the circuit duties imposed on the Supreme Court justices. But the Report also suggested a number of amendments dealing with procedural matters. A section of the proposed bill submitted by him provided that "no injunction in equity shall be granted by a district court to a judgment at law of a State court." *Id.*, p. 26. Randolph explained that this clause "will debar the district court from interfering with the judgments at law in the State courts; for if the plaintiff and defendant rely upon the State courts, as far as the judgment, they ought to continue there as they have begun. It is enough to split the same suit into one at law, and another in equity, without adding a further separation, by throwing the common law side of the question into the State courts, and the equity side into the federal courts." *Id.*, p. 34. The Report was considered by the House sitting as a Committee of the Whole, and then was referred to successive special committees for further consideration. No action was taken until after Chief Justice Jay and his associates wrote the President that their cir-

---

[2] Formulated as a contraction of the federal courts' equity jurisdiction, the Act of 1793 "limits their general equity powers in respect to the granting of a particular form of equitable relief; that is, it prevents them from granting relief by way of injunction in the cases included within its inhibitions." *Smith* v. *Apple*, 264 U. S. 274, 279. See *Treinies* v. *Sunshine Mining Co.*, 308 U. S. 66, 74.

cuit-riding duties were too burdensome. American State Papers, Misc., vol. 1, No. 32, p. 51. In response to this complaint, which was transmitted to Congress, the Act of March 2, 1793, was passed, containing in § 5, *inter alia,* the prohibition against staying state court proceedings.

Charles Warren in his article *Federal and State Court Interference,* 43 Harv. L. Rev. 345, 347, suggests that this provision was the direct consequence of Randolph's report. This seems doubtful, in view of the very narrow purpose of Randolph's proposal, namely, that federal courts of equity should not interfere with the enforcement of judgments at law rendered in the state courts. See Taylor and Willis, *The Power of Federal Courts to Enjoin Proceedings in State Courts,* 42 Yale L. J. 1169, 1171, n. 14.

There is no record of any debates over the statute. See 3 Annals of Congress (1791–93). It has been suggested that the provision reflected the then strong feeling against the unwarranted intrusion of federal courts upon state sovereignty. *Chisholm* v. *Georgia,* 2 Dall. 419, was decided on February 18, 1793, less than two weeks before the provision was enacted into law. The significance of this proximity is doubtful. Compare Warren, *Federal and State Court Interference,* 43 Harv. L. Rev. 345, 347–48, with *Gunter* v. *Atlantic Coast Line,* 200 U. S. 273, 291–92. Much more probable is the suggestion that the provision reflected the prevailing prejudices against equity jurisdiction. The *Journal of William Maclay* (1927 ed.), chronicling the proceedings of the Senate while he was one of its members (1789–1791), contains abundant evidence of a widespread hostility to chancery practice. See especially, pp. 92–94, 101–06 (debate on the bill that became Judiciary Act of 1789). Moreover, Senator Ellsworth (soon to become Chief Justice of the United States), the principal draftsman of both the 1789 and 1793 Judiciary Acts, often indicated a dislike for equity jurisdiction. See Brown, *Life of Oliver Ellsworth* (1905 ed.) 194; *Journal of William Maclay* (1927 ed.) 103–04; Warren, *New*

*Light on the History of the Federal Judiciary Act of 1789,*
37 Harv. L. Rev. 49, 96–100.[3]

Regardless of the various influences which shaped the enactment of § 5 of the Act of March 2, 1793, the purpose and direction underlying the provision are manifest from its terms: proceedings in the state courts should be free from interference by federal injunction. The provision expresses on its face the duty of "hands off" by the federal courts in the use of the injunction to stay litigation in a state court.[4]

*Second.* The language of the Act of 1793 was unqualified: ". . . nor shall a writ of injunction be granted to stay proceedings in any court of a state . . ." 1 Stat. 335. In the course of one hundred and fifty years, Congress has made few withdrawals from this sweeping prohibition:

(1) *Bankruptcy proceedings.* This is the only legislative exception which has been incorporated directly into § 265: ". . . except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy." 36 Stat. 1162. This provision, based upon § 21 of the Bankruptcy Act of 1867, 14 Stat. 526, was inserted in the Act of 1793 by the Revisers. R. S. § 720;

---

[3] The last clause of § 5 of the Act of 1793, outlawing the familiar *ex parte* injunction, affords another illustration of hostility to chancery practice: "nor shall such writ [of injunction] be granted in any case without reasonable previous notice to the adverse party, or his attorney, of the time and place of moving for the same." 1 Stat. 335.

[4] Section 262 of the Judicial Code, 36 Stat. 1162, 28 U. S. C. § 377, is derived from § 14 of the Judiciary Act of 1789, 1 Stat. 81, which provided that the "courts of the United States shall have power to issue writs of *scire facias, habeas corpus,* and all other writs not specially provided for by the statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." The general powers thus given to the federal courts were obviously limited by the subsequent enactment of the specific prohibitory provisions of the Act of 1793.

see Proposed Draft of Revision of U. S. Statutes (1872), vol. 1, pp. 418.

(2) *Removal of actions.* The Removal Acts, ever since the Act of September 24, 1789, 1 Stat. 73, 79, have provided that whenever any party entitled to remove a suit shall file with the state court a proper petition for removal and a bond with good and sufficient surety, it shall then be the duty of the state court to accept such petition and bond "and proceed no further in the cause." Section 265 has always been deemed inapplicable to removal proceedings. *Dietzsch* v. *Huidekoper,* 103 U. S. 494; *Madisonville Traction Co.* v. *Mining Co.,* 196 U. S. 239. The true rationale of these decisions is that the Removal Acts qualify *pro tanto* the Act of 1793. Subsequent decisions have clarified the loose ground advanced in *French* v. *Hay,* 22 Wall. 250, 253. See *Kline* v. *Burke Construction Co.,* 260 U. S. 226; Taylor and Willis, *The Power of Federal Courts to Enjoin Proceedings in State Courts,* 42 Yale L. J. 1169, 1174–75; compare *Bryant* v. *Atlantic Coast Line R. Co.,* 92 F. 2d 569, 571.

(3) *Limitation of shipowners' liability.* The Act of 1851 limiting the liability of shipowners provides that after a shipowner transfers his interest in the vessel to a trustee for the benefit of the claimants, "all claims and proceedings against the owner or owners shall cease." 9 Stat. 635, 636. Being a "subsequent statute" to the Act of 1793, this provision operates as an implied legislative amendment to it. *Providence & N. Y. S. S. Co.* v. *Hill Mfg. Co.,* 109 U. S. 578, 599; see Admiralty Rule 51, 254 U. S., appendix, p. 26.

(4) *Interpleader.* The Interpleader Act of 1926, 44 Stat. 416, amended the 1917 Interpleader Act, 39 Stat. 929, to provide as follows: "Notwithstanding any provision of the Judicial Code to the contrary, said [district] court shall have power to issue its process for all such claimants and to issue an order of injunction against each of them, enjoining them from instituting or prose-

cuting any suit or proceeding in any State court or in any other Federal court . . ." See *Dugas* v. *American Surety Co.*, 300 U. S. 414, 428; *Treinies* v. *Sunshine Mining Co.*, 308 U. S. 66, 74.

(5) *Frazier-Lemke Act.* The filing of a petition for relief under this Act subjects the farmer and his property, wherever located, to the "exclusive jurisdiction" of the federal court. And except with the consent of the court, specified proceedings against the farmer or his property "shall not be instituted, or if instituted at any time prior to the filing of a petition under this section, shall not be maintained, in any court . . ." 47 Stat. 1473. See *Kalb* v. *Feuerstein*, 308 U. S. 433.

*Third.* This brings us to applications of § 265 apart from these statutory qualifications. The early decisions of this Court applied the Act of 1793 as a matter of course.[5] However, a line of cases beginning with *Hagan*

---

[5] The first case arising under the provision was *Diggs & Keith* v. *Wolcott*, 4 Cranch 179 (1807), where the appellants brought an action at law on various promissory notes in a state court. While this action was still pending, the defendant filed a bill in the state chancery court for cancellation of the notes. The latter suit was removed to the federal circuit court which cancelled the notes and enjoined the further prosecution of the state action at law. The report of the proceeding in this Court states merely that "the court being of opinion that a circuit court of the United States had not jurisdiction to enjoin proceedings in a state court, reversed the decree." In his *Commentaries on American Law* (1826) vol. 1, p. 386, Chancellor Kent, stating that the decision in the case "is not to be contested," refers to it as illustrative of a situation "in which any control by the federal over the state courts, other than by means of the established appellate jurisdiction, has equally been prevented." *Peck* v. *Jenness*, 7 How. 612, 625, holding that a federal court sitting in bankruptcy could not discharge the lien of a prior attachment made under state law, was the first case which expressly relied upon the Act of 1793. In *Orton* v. *Smith*, 18 How. 263, 266, the Court held it error to enjoin a state action to establish title to certain land. "The courts of the United States have no such power over suitors in a state court."

v. *Lucas,* 10 Pet. 400, holds that the court, whether federal or state, which first takes possession of a *res* withdraws the property from the reach of the other. *Taylor* v. *Carryl,* 20 How. 583, 597; *Freeman* v. *Howe,* 24 How. 450. See *Kline* v. *Burke Construction Co.,* 260 U. S. 226, 235: "The rank and authority of the [federal and state] courts are equal but both courts cannot possess or control the same thing at the same time, and any attempt to do so would result in unseemly conflict. The rule, therefore, that the court first acquiring jurisdiction shall proceed without interference from a court of the other jurisdiction is a rule of right and of law based upon necessity, and where the necessity, actual or potential, does not exist, the rule does not apply. Since that necessity does exist in actions *in rem* and does not exist in actions *in personam,* involving a question of personal liability only, the rule applies in the former but does not apply in the latter."

The Act of 1793 expresses the desire of Congress to avoid friction between the federal government and the states resulting from the intrusion of federal authority into the orderly functioning of a state's judicial process. The reciprocal doctrine of the *res* cases is but an application of the reason underlying the Act. Contest between the representatives of two distinct judicial systems over the same physical property would give rise to actual physical friction. The rule has become well settled, therefore, that § 265 does not preclude the use of the injunction by a federal court to restrain state proceedings seeking to interfere with property in the custody of the court.[6] *Farmers' Loan & Trust Co.* v. *Lake Street R. Co.,* 177

---

[6] The extent to which a federal court's exclusive control over the *res* may require use of the injunction to effectuate its decrees *in rem* is illustrated by *Riverdale Mills* v. *Manufacturing Co.,* 198 U. S. 188; *Julian* v. *Central Trust Co.,* 193 U. S. 93; and *Local Loan Co.* v. *Hunt,* 292 U. S. 234, 241. Cf. *Ex parte Baldwin,* 291 U. S. 610, 615.

U. S. 51, 61; *Kline* v. *Burke Construction Co.*, 260 U. S. 226, 229, 235; *Lion Bonding Co.* v. *Karatz*, 262 U. S. 77, 88–89; see Warren, *Federal and State Court Interference*, 43 Harv. L. Rev. 345, 359–66. And where a state court first acquires control of the *res*, the federal courts are disabled from exercising any power over it, by injunction or otherwise. *Palmer* v. *Texas*, 212 U. S. 118.

Another group of cases is said to constitute an exception to § 265, namely, where federal courts have enjoined litigants from enforcing judgments fraudulently obtained in the state courts. *Marshall* v. *Holmes*, 141 U. S. 589; *Simon* v. *Southern Railway Co.*, 236 U. S. 115; *Essanay Film Co.* v. *Kane*, 258 U. S. 358; *Atchison, T. & S. F. Ry. Co.* v. *Wells*, 265 U. S. 101; *Wells Fargo & Co.* v. *Taylor*, 254 U. S. 175. In the *Simon* case, Mr. Justice Lamar undertook to rationalize this class of cases by regarding a state court "proceeding" as completed once judgment is secured, with the result that an injunction against levying execution does not stay a judicial "proceeding." 236 U. S. at 124. But this construction of § 265 was rejected in *Hill* v. *Martin*, 296 U. S. 393, 403: "That term [proceedings] is comprehensive. It includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process. It applies to appellate as well as to original proceedings; and is independent of the doctrine of *res judicata*. It applies alike to action by the court and by its ministerial officers; applies not only to an execution issued on a judgment, but to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective." However, the opinion cites the *Wells Fargo* and *Essanay Film* cases in a footnote dealing with "the recognized exceptions to § 265." 296 U. S. 403, n. 19. The foundation of these cases is thus very doubtful. However, we need not under-

take to reëxamine them here since, in any event, they do not govern the cases at bar.[7]

*Fourth.* We come, then, to the so-called "relitigation" cases, the first of which is *Dial* v. *Reynolds,* 96 U. S. 340. The facts of the case are simple: Cooper was indebted to Staatsman. To secure these debts he executed a mortgage deed of trust under which Dial was trustee. Asserting title in himself to the property covered by the mortgage, Reynolds brought ejectment against Cooper in the federal court. On writ of error this Court set aside a judgment in Reynolds' favor and held title to be in Cooper. *Cooper* v. *Reynolds,* 10 Wall. 308, 321. Reynolds thereafter dismissed his ejectment action in the federal court and brought a new action against Cooper in a Tennessee state court based upon the claim thus previously litigated. Dial and Staatsman, joining Cooper as a party defendant, filed suit in the federal court to foreclose the mortgage and to enjoin Reynolds from further prosecuting his action in the state court. The lower court sustained Reynolds' demurrer, and this Court affirmed. It held that the "gravamen" of the bills was an injunction to prevent Reynolds from proceeding in the state court. "Such an injunction, except under the Bankrupt Act, no court of the United States can grant. With this exception, it is expressly forbidden by law." 96 U. S. at 341.[8]

---

[7] For similar reasons we need not here consider cases like *Ex parte Young,* 209 U. S. 123, and *Gunter* v. *Atlantic Coast Line,* 200 U. S. 273, with which compare *Hale* v. *Bimco Trading Co.,* 306 U. S. 375, 378.

[8] The Court also held that in a foreclosure proceeding the complainant cannot join a third person who claims adversely to the mortgagor and mortgagee, and that consequently there was a misjoinder of parties. 96 U. S. at 341. These grounds for decision were, of course, alternative, and either alone was sufficient to dispose of the case. However, they were entirely separate and distinct, and there

138

*Looney* v. *Eastern Texas R. Co.*, 247 U. S. 214, was not a "relitigation" case. The Texas federal district court, in a suit brought by various carriers, granted a preliminary injunction restraining the state Attorney General from proceeding to assess fines and penalties upon them for complying with an order of the Interstate Commerce Commission. The Attorney General nevertheless instituted proceedings in a state court to enjoin the carriers from complying with the Commission's order, and a supplemental bill was filed in the federal court to stay the proceedings. The district court issued the injunction, and this Court dismissed an appeal under § 266, holding that the injunction below was not based upon the unconstitutionality of the Texas state statutes, but was granted merely to protect its jurisdiction until the suit brought by the carriers was finally settled. The case obviously does not rule ours. *Supreme Tribe of Ben-Hur* v. *Cauble*, 255 U. S. 356, held that a federal district court, having rendered a decree in a class suit brought in behalf of all the members of a certain class of beneficiaries in a fraternal association, may enjoin members of the class, found to be bound by the decree, from prosecuting suits in the state courts which would relitigate questions settled by such decree. The opinion of Mr. Justice Day contains no reference to either the Act of March 2, 1793, or to *Dial* v. *Reynolds*. The opinion is devoted almost entirely to a discussion of whether the former decree is *res judicata* in the state suits. Having determined this question in the affirmative, the Court disposed of the remaining—§ 265—question in one sentence, citing only one case in support of its conclusion, *Looney* v. *Eastern*

is no basis for any inference that the Court might have upheld an injunction if Reynolds had been properly joined. Nor need we consider common-law refinements in actions for ejectment, for the Court went explicitly on its duty to obey the Act of 1793.

*Texas R. Co., supra,* which, as we have seen, was not a relitigation case.[9]  255 U. S. at 367.

*Fifth.* We find, therefore, that apart from Congressional authorization, only one "exception" has been imbedded in § 265 by judicial construction, to wit, the *res* cases.  The fact that one exception has found its way into § 265 is no justification for making another.  Furthermore, the *res* exception, having its roots in the same policy from which sprang § 265, has had an uninterrupted and firmly established acceptance in the decisions.  The rule of the *res* cases was unequivocally on the books when Congress reënacted the original § 5 of the Act of 1793, first by the Revised Statutes of 1874 and later by the Judicial Code in 1911.

In striking contrast are the "relitigation cases."  Loose language and a sporadic, ill-considered decision cannot be held to have imbedded in our law a doctrine which so patently violates the expressed prohibition of Congress.[10]

---

[9] *Root* v. *Woolworth,* 150 U. S. 401, is erroneously regarded as illustrating a "relitigation" exception to § 265.  The case holds merely that courts of equity have jurisdiction to "effectuate their own decrees by injunctions or writs of assistance in order to avoid the relitigation of questions once settled between the same parties." 150 U. S. at 411–12.  The Court did not uphold a federal injunction against a state suit to relitigate a claim already settled by a previous federal decree—no such state suit had been brought.  Consequently, there was no occasion to consider the applicability of § 265.  The "first come, first served" rationale of cases like *Prout* v. *Starr,* 188 U. S. 537, was discarded in *Kline* v. *Burke Construction Co.,* 260 U. S. 226, 235.  Cf. *Haines* v. *Carpenter,* 91 U. S. 254, 257.

[10] There is no warrant for the assumption that, in the proposals for the Judicial Code of 1911, Congress had before it the "relitigation" exception as settled doctrine, and that by § 265 gave it legislative confirmation.  The Report of the Special Joint Committee on Revision and Codification of the Laws of the United States annotated the Act of 1793 with citations to twenty-six decisions of this Court. Sen. Rept. No. 388, 61st Cong., 2d Sess., p. 470.  Yet no reference was made to four of the five decisions of this Court prior to the

We are not dealing here with a settled course of decisions, erroneous in origin but around which substantial interests have clustered. Only a few recent and episodic utterances furnish a tenuous basis for the exception which we are now asked explicitly to sanction. Whatever justification there may be for turning past error into law when reasonable expectations would thereby be defeated, no such justification can be urged on behalf of a procedural doctrine in the distribution of judicial power between federal and state courts. It denies reality to suggest that litigants have shaped their conduct in reliance upon some loose talk in past decisions in the application of § 265 or, more concretely, upon erroneous implications drawn from *Looney* v. *Eastern Texas R. Co.*, *supra*, and *Supreme Tribe of Ben-Hur* v. *Cauble*, *supra*. Compare *Helvering* v. *Hallock*, 309 U. S. 106, 119–20.

It is indulging in the merest fiction to suggest that the doctrine which for the first time we are asked to pronounce with our eyes open and in the light of full consideration, was so obviously and firmly part of the texture of our law that Congress in effect enacted it through its silence. There is no occasion here to regard the silence of Congress as more commanding than its own plainly

Judicial Code which are supposed to justify the "relitigation" doctrine: *Root* v. *Woolworth*, 150 U. S. 401; *Prout* v. *Starr*, 188 U. S. 537; *Riverdale Mills* v. *Manufacturing Co.*, 198 U. S. 188; *Gunter* v. *Atlantic Coast Line*, 200 U. S. 273. (As we have already seen, "removal" cases like *French* v. *Hay*, 22 Wall. 250, and *Dietzsch* v. *Huidekoper*, 103 U. S. 494, rest upon an entirely different footing.) None of the reports submitted to Congress contains any discussion of § 5 of the Act of 1793 and the decisions construing it. See H. Rept. No. 818, 61st Cong., 2d Sess., referring to H. Doc. No. 783, 61st Cong., 2d Sess.; Sen. Rept. No. 388, 61st Cong., 2d Sess.; Final Report of the Commission to Revise and Codify the Laws of the United States (1906), pp. 29, 244. Nor do the debates disclose any consideration of the question. See 45 Cong. Rec., pts. III and IV, and 46 Cong. Rec., pts. I–V, *passim*.

and unmistakably spoken words. This is not a situation where Congress has failed to act after having been requested to act or where the circumstances are such that Congress would ordinarily be expected to act. The provisions of § 265 have never been the subject of comprehensive legislative reëxamination. Even the exceptions referable to legislation have been incidental features of other statutory schemes, such as the Removal and Interpleader Acts. The explicit and comprehensive policy of the Act of 1793 has been left intact. To find significance in Congressional nonaction under these circumstances is to find significance where there is none.

Section 265 is not an isolated instance of withholding from the federal courts equity powers possessed by Anglo-American courts. As part of the delicate adjustments required by our federalism, Congress has rigorously controlled the "inferior courts" in their relation to the courts of the states. The unitary system of the courts of England is saved these problems.

The guiding consideration in the enforcement of the Congressional policy was expressed by Mr. Justice Campbell, for the Court, in *Taylor* v. *Carryl,* 20 How. 583, 597:

"The legislation of Congress, in organizing the judicial powers of the United States, exhibits much circumspection in avoiding occasions for placing the tribunals of the States and of the Union in any collision."

We must be scrupulous in our regard for the limits within which Congress has confined the authority of the courts of its own creation.

*Reversed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of No. 19.

MR. JUSTICE REED, dissenting:

The controlling issue in both the *Toucey* and the *Phoenix Finance* cases is the power of a federal court to pro-

tect those who have obtained its decrees against an effort to force relitigation of the same causes of action in the state courts. Questions of *res judicata* seem inapposite for the conclusion. We are not concerned in either case with the effect of the decrees if and when they might be pleaded in the state actions. Since federal jurisdiction in each case depended upon diversity, their effect as a pleaded bar to recovery in the state suits would depend upon the faith and credit by law or usage given like judgments of courts of the state containing the federal district.[1] But when the preliminary question is the meaning and application of the federal decree as a basis for a conclusion as to whether or not the decree shall be enforced by further steps, it is entirely a federal question. It is immaterial from that point of view whether the federal jurisdiction was bottomed originally on diversity, or the Constitution or laws of the United States. The power to give effect to the judgments of federal courts rests with Congress.[2] It has exercised that power for general purposes by Judicial Code § 262.[3]

As originally enacted, § 265 was a single line in a two page act concerning practice in the federal courts, Act of March 2, 1793, c. 22, § 5, 1 Stat. 334. The act's disconnected provisions were amendments to the statute establishing Judicial Courts of the United States. The short section in which § 265 appeared on the one hand enlarged

---

[1] R. S. § 905; 28 U. S. C. § 687; *Hancock National Bank* v. *Farnum*, 176 U. S. 640.

[2] *Embry* v. *Palmer*, 107 U. S. 3, 9; *Atchison, T. & S. F. Ry. Co.* v. *Sowers*, 213 U. S. 55, 64.

[3] "The Supreme Court and the district courts shall have power to issue writs of scire facias. The Supreme Court, the circuit courts of appeals, and the district courts shall have power to issue all writs not specifically provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the usages and principles of law." (R. S. § 716; Act of Mar. 3, 1911, c. 231, § 262, 36 Stat. 1162.)

equity powers of judges of this Court by authorizing them to issue writs of *ne exeat* and injunction, and on the other restricted the use of restraining orders without notice. Left to the four corners of the act, for lack of legislative materials, for deductions as to the purpose and intention of the enacting Congress, and faced with the absolute prohibition of its words, it might well be concluded that the intention was to bar an injunction running against the court itself as distinguished from the parties.[4] The fact that courts of equity had long exercised the power to entertain bills to carry their decrees into execution by injunction against the parties adds strength to such a supposition.[5] Such needed powers would not be lightly withdrawn.

We are not relegated to such speculations, however. This provision in one form or another has been embodied in our statute law since 1793. It was continued by the adoption of the Revised Statutes of 1878 and the Judicial Code of 1911. It and the cases interpreting it have been woven into the fabric of our law through the decades. What changes would have been made in its form to meet the needs of our expanding jurisprudence, were it not for the flexibility supplied by judicial interpretation, we can only conjecture. Certainly when the Code of 1911 restated its terms, the Congress took into consideration what had by that time come to be its accepted interpretation. Granted that § 265 is not a sentence or section of a legislative scheme whose meaning is to be sought in the purpose of the entire enactment or series of enactments,[6]

---

[4] Cf. *Steelman* v. *All Continent Corp.*, 301 U. S. 278, 290; Warren, *Federal and State Court Interference*, (1930) 43 Harv. L. Rev. 345, 372.

[5] Story, Equity Pleadings (10th Ed.) § 429; Mitford, Pleadings in Chancery (1780) p. 38; Cooper, Equity Pleading, (1809) pp. 98, 99; *Booth* v. *Leycester*, 1 Keen 579 (1837); *Kershaw* v. *Thompson*, 4 Johns. Ch. 609 (N. Y. 1820).

[6] Cf. *United States* v. *American Trucking Assns.*, 310 U. S. 534, 543.

144

we are nevertheless led by the judicial history intervening since its passage to look beyond the literal language and give weight to those decisions which had added to its content before the reënactment in the Judicial Code. In the Senate Report of the Special Joint Committee on Revision and Codification no change in language was suggested. Yet the Committee, as indicative of the then state of the law, cited numerous cases which are relitigation cases and are analyzed or referred to later in this opinion.[7] We are all the more persuaded to believe that the Code of 1911 intended to accept this early legislation with its judicial gloss because of the alternative offered. This alternative is that a federal judgment entered perhaps after years of expense in money and energy and after the production of thousands of pages of evidence comes to nothing that is final. It is to be only the basis for a plea of *res judicata* which is to be examined by another court, unfamiliar with the record already made, to determine whether the issues were or were not settled by the former adjudication.[8] We, too, desire that the difficulties innate in the federal system of government may be smoothed away without a clash of sovereignties, but we find no cause for alarm in affirming a court which forbids parties bound by its decree to fight the battle over on another day and field.[9] We should not, in reaching for theoretical symmetry, hamper the efficiency and needlessly break the continuity of our judicial methodology. A decree forbidding a defeated party from setting up any right, anywhere, based upon

---

[7] *French* v. *Hay,* 22 Wall. 250; *Dietzsch* v. *Huidekoper,* 103 U. S. 494; *Julian* v. *Central Trust Co.,* 193 U. S. 112; *Sharon* v. *Terry,* 36 F. 337; *Garner* v. *Second National Bank,* 67 F. 833; *Central Trust Co.* v. *Western N. C. R. Co.,* 89 F. 24; *James* v. *Central Trust Co.,* 98 F. 489; *Chicago, R. I. & P. Ry. Co.* v. *St. Joseph Union Depot Co.,* 92 F. 22; *State Trust Co.* v. *Kansas City, P. & G. R. Co.,* 110 F. 10.

[8] *Dietzsch* v. *Huidekoper,* 103 U. S. 494, 498.

[9] Cf. *Princess Lida* v. *Thompson,* 305 U. S. 456, 466.

claims adjudged, is the usual form where injunctions are appropriate for determining controversies.[10]

The courts properly are hesitant to depart from literalism in interpreting a statute.[11] Strong equities do induce departure from the ordinary course where the purpose of the Congress appears plain.[12] It is hard to conceive of a statute, new or old, which has a meaning totally disassociated from supporting legislation or the body of adjudications within its ambit. This statute is in a posture much more favorable for the interpretation that it authorizes injunctions against relitigation in state courts than were the statutes construed in any of the cases cited in the preceding note for the interpretation given them. In fact, we conclude that its restatement in the Code of 1911, with the decisions now to be examined in existence, necessitates the interpretation here advocated. Additional decisions since 1911 and the failure of Congress to repudiate this interpretation add something of substance to this argument.

There exists no divergence of view in regard to the power of federal courts to enjoin proceedings in state courts where the state action may embarrass or interfere with the federal court's prior control over a *res* which is in its possession.[13] That is an exception to § 265. Equally firmly embedded is the power, long exercised as compatible with § 265, of carrying into execution by injunction against state actions the equitable decrees which have settled rights or claims between the parties to the federal litigation. This might be said to be auxiliary to the protective jurisdiction over property in the possession

---

[10] E. g., *In re Chiles*, 22 Wall. 157, 166; *Sharon* v. *Terry*, 36 F. 337, 345.

[11] Cf. *Southern Railway Co.* v. *Painter, post,* p. 155.

[12] *United States* v. *American Trucking Assns.,* 310 U. S. 534; *United States* v. *Guaranty Trust Co.,* 280 U. S. 478; *Miller* v. *Nut Margarine Co.,* 284 U. S. 498; *Allen* v. *Regents,* 304 U. S. 439.

[13] *Kline* v. *Burke Construction Co.,* 260 U. S. 226, 229.

of a court. Inasmuch, however, as the cases hereafter cited concern rights arising from claims already adjudicated, and since, in the cases where a *res* was at one time involved, the property was no longer in the possession of the court issuing the injunction, the theory of preventing an unseemly clash over physical possession has no basis. The principle for which the following authorities stand is that a court has the right to execute its decrees to avoid relitigation and forced reliance on *res judicata.* The proceedings, as will be made to appear later, which were supplemented by the orders prohibiting state suits here under review, fall well within the limits of this hitherto well recognized conception.

As early as 1893 this Court declared, in *Root* v. *Woolworth,* 150 U. S. 401, 411, that the "jurisdiction of courts of equity to interfere and effectuate their own decrees by injunctions or writs of assistance in order to avoid the relitigation of questions once settled between the same parties, is well settled." Root, the party enjoined by the original decree, asserted rights which would require relitigation of settled issues. Accordingly he was enjoined on supplemental bill, *inter alia,* "from bringing any action or actions touching the title to or possession of the said premises . . ." Until dissolved, that injunction forbade proceedings in state and federal courts alike. Although § 265 was not discussed, the case is cited as a convenient summary of the then law, and because it promptly became a precedent for enforcement of decrees even when the problem of § 265 was raised. The authority of this case has not been doubted until now.

*Prout* v. *Starr,* 188 U. S. 537, 544, forbade a state suit in violation of a federal court stipulation for a decree, treated the stipulation as a decree, and enjoined an action *in personam* in the state court for the collection of penalties under an unconstitutional statute. The state action was in violation of the original federal decree. This Court said: "The jurisdiction of the Circuit Court could not be

defeated or impaired by the institution, by one of the parties, of subsequent proceedings, whether civil or criminal, involving the same legal questions, in the state court."

In 193 U. S. appeared the case of *Julian* v. *Central Trust Company*. A railroad property in North Carolina had been sold under foreclosure proceedings in the federal circuit court. The decree was that the property be sold free of all claims of parties and the judicial sale was confirmed to the Southern Railway Company. Some years later a cause of action arose which was prosecuted to judgment in a state court against the original mortgagor without notice to or claim against the purchaser, the Southern. In the face of a threat to sell the property formerly conveyed by the federal decree, the circuit court enjoined the state proceedings. This Court said, pp. 112, 114: "In such case we are of opinion that a supplemental bill may be filed in the original suit with a view to protecting the prior jurisdiction of the Federal court and to render effectual its decree. . . . In such cases where the Federal court acts in aid of its own jurisdiction and to render its decree effectual, it may, notwithstanding sec. 720, Rev. Stat., [§ 265 J. C.] restrain all proceedings in a state court which would have the effect of defeating or impairing its jurisdiction. . . . It is conceded that the Federal right could be set up in the state court from which the execution issued, and, if denied, the ultimate rights of the parties can be determined upon writ of error to this court. In the view we have taken of this case the Federal court had not lost its jurisdiction to protect the purchaser at its sale upon direct proceedings such as are now before us." [14]

---

[14] The doctrine of the *Julian* case finds illustrations in the lower federal courts. While it is true that those courts were enforcing foreclosure, that purpose had been accomplished and the enjoined state suits sought relitigation of closed issues. *James* v. *Central Trust Co.*, 98 F. 489 (1899), modifying *Central Trust Co.* v. *Western N. C. R. Co.*, 89 F. 24 (1898); *State Trust Co.* v. *Kansas City, P. & G. R. Co.*, 110 F. 10 (1901); *Central Trust Co.* v. *Western North Carolina R. Co.*, 112 F. 471 (1901); *Alton Water Co.* v. *Brown*, 166 F. 840 (1908).

148

*Riverdale Mills* v. *Manufacturing Co.*, 198 U. S. 189, followed the established doctrine. The Riverdale Mills acquired property by judicial sale in the federal court. A state proceeding later was begun by parties to the federal foreclosure alleging the invalidity of the sale and seeking possession of the property. Riverdale then filed an ancillary bill in the original foreclosure suit for an injunction against prosecution of the state suit. Against the claimed protection of R. S. § 720 (§ 265 J. C.), p. 193, it was held here that a federal court may "protect the title which it has decreed as against every one a party to the original suit and prevent that party from relitigating the questions of right which have already been determined." P. 195.

It is quite clear that the Court in both the *Julian* and the *Riverdale* cases was intent not on protecting a *res,* since that had long passed from its hands, but on avoiding relitigation by executing its decrees. This appears particularly from their reliance upon *French* v. *Hay,* 22 Wall. 250; *Dietzsch* v. *Huidekoper,* 103 U. S. 494; and *Sharon* v. *Terry,* 36 F. 337. In the *French* case no *res* was involved. It was a federal injunction against the enforcement of a judgment of a state court obtained in a state action after removal of a related but separate state suit. The reasoning proceeded upon the protection of federal judgments, not on the language of the removal statute. The same is true of *Dietzsch.* There a state suit on a replevin bond was enjoined by the federal court because it grew out of a failure to return property awarded in replevin in a state court after the removal of the original replevin suit to the federal court which issued the injunction. It was there said, p. 497: "A court of the United States is not prevented from enforcing its own judgments by the statute which forbids it to grant a writ of injunction to stay proceedings in a State court."

The Court today lays aside *Gunter* v. *Atlantic Coast Line,* 200 U. S. 273 (1906), as inapplicable. The case in our view may be properly cited as a relitigation decision. It forcefully declares, albeit by alternative ruling, for the position here taken. A federal court had enjoined a state tax on the ground of unconstitutionality. The state was a party. Years later the state brought an action in the state court for the tax which the decree prohibited. An ancillary bill sought and obtained an injunction from the federal court. This Court said, p. 292, "Indeed, the proposition that the Eleventh Amendment, or section 720 of the Revised Statutes, control a court of the United States in administering relief, although the court was acting in a matter ancillary to a decree rendered in a cause over which it had jurisdiction, is not open for discussion. *Dietzsch* v. *Huidekoper,* 103 U. S. 494; *Prout* v. *Starr,* 188 U. S. 537; *Julian* v. *Central Trust Co.,* 193 U. S. 93, 112." It cannot fairly be said, we think, that this was not a holding that a federal court has the duty to protect its parties against relitigation. This seems quite certain when we examine the cases cited which are discussed heretofore in this opinion.

The *Terry* case, cited under the *Riverdale Mills* case, *supra,* is a good illustration of the permeation of our law by the principle of protection of federal decrees by injunctions against prosecuting state suits which relitigate settled issues. In *Sharon* v. *Terry,* a former decree had determined the fraudulent character of a marriage contract, and had enjoined all efforts to establish rights under any of its provisions. Notwithstanding this decree, a party thereafter sought and obtained a judgment of the highest court of the state determining the marriage contract valid. There was no plea of *res judicata* in the state proceedings. After the entry of the state judgment, the personal representative of the winning party in the federal suit revived that proceeding and obtained a

renewal of the injunction over the specific objection that R. S. § 720 (§ 265 J. C.) barred the order. 36 F. 337, 365.

The opinion was by Justice Field of this Court, on circuit, and stated: " The decree of the federal court, when revived, may be used to stay any attempted enforcement of the judgment of the state court." P. 364. It is true that the opinion shows that the circuit court was of the view that prior jurisdiction of an *in personam* cause gave the federal court authority to issue an injunction against state proceedings. P. 366. But the decision was directly on the point of enforcement of a decree. When the case came to this Court it was affirmed without consideration of § 265 on the ground that the propriety of the revivor was the only matter for decision, 131 U. S. 40.

In the later case of *Missouri Pacific Ry. Co.* v. *Jones,* 170 F. 124 (1909), a federal court had decided that a state statute fixing railroad rates was unconstitutional, and had entered decrees for the railroads accordingly. Thereafter, a county attorney commenced a suit in the state court against the companies to restrain collection of any but the statutory rate. On supplemental bill by the railroads the federal court enjoined him from prosecuting that suit, and relitigating the rate controversy. Similarly, in *St. Louis Mining & Milling Co.* v. *Montana Mining Co.,* 148 F. 450 (1906), the unsuccessful party in the federal suit was enjoined from proceeding further in the state court to relitigate matters already decided.[15] The fact that the federal proceeding was ancillary to an action to try title seems to have had no part in the decision.[16]

---

[15] Cf. *Garner* v. *Second National Bank,* 67 F. 833 (1895).

[16] There are instances of the recognition of the power to prevent relitigation despite R. S. § 720 though the power was not actually exercised. *Chicago, R. I. & P. Ry.* v. *St. Joseph Union Depot Co.,* 92 F. 22, 25 (1898); *Guardian Trust Co.* v. *Kansas City Southern*

These cases were all handed down before the adoption of the Judicial Code in 1911. They are catalogued to show that the power of the federal courts to make their decrees effective was accepted as consonant with the general prohibition of § 265. Pomeroy taught that this was the law in 1905.[17] The rule was applied after 1911 when occasion arose. By *Supreme Tribe of Ben-Hur* v. *Cauble,* 255 U. S. 356, 367, it was decided in 1921 almost without discussion that a federal court which had entered a decree as to rights in a fraternal benefit association in a class suit might enjoin by ancillary bill other members of the class from relitigating the issues in a state suit. *Looney* v. *Eastern Texas R. Co.,* 247 U. S. 214, cited as a controlling precedent, was suggested there by appellant, the Supreme Tribe of Ben-Hur, upon the very point here under discussion. *Id.,* 65 Law. Ed. 675. This Court now lays the *Looney* case aside as not being a "relitigation" case. While the injunction in the *Looney* case was not in aid· of a decree, it was in aid of jurisdiction taken to determine a Texas rate controversy. A temporary injunction had been entered to maintain the status quo until a review by the Interstate Commerce Commission. A temporary injunction may well be likened to a decree and entitled to the same protection against relitigation. Such was evidently this Court's view. It said, page 221: "So important is it that unseemly conflict of authority between state and federal courts should be avoided by maintaining the jurisdiction of each free from the encroachments of the other, that § 265 of the Judicial Code, Rev. Stats., § 720, Act of March 2, 1793,

*Ry. Co.,* 146 F. 337, 340 (1906). *Craft* v. *Lathrop,* Fed. Cas. No. 3318 (1851), presents the converse situation of the exercise of this power without consideration of the contemporary equivalent of § 265.

[17] II Pomeroy's Equitable Remedies (1905) § 640, p. 1079. After discussing § 265—"Accordingly, a federal court may grant an injunction against a proceeding in a state court when necessary to render effective its own decree."

c. 22, 1 Stat. 334, has repeatedly been held not applicable to such an injunction."

The last case in this Court, *Local Loan Co.* v. *Hunt,* 292 U. S. 234, upheld by a unanimous court an injunction, upon an ancillary bill in a bankruptcy proceeding, forbidding the prosecution in a state court of a claim discharged in bankruptcy. This Court placed its decision squarely on the jurisdiction of the bankruptcy court to execute its decrees "notwithstanding the provisions of § 265 of the Judicial Code." Quite properly no mention is made of the exception in § 265 "except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy." The only authorization for injunctions is in Bankruptcy Act § 11, 11 U. S. C. § 29, which provides for a stay of pending suits during adjudication in bankruptcy. This is substantially the language of § 21 of the Bankruptcy Act of 1867, 14 Stat. 526, which caused the insertion of the exception in the Revised Statutes, as is shown by the cross-reference under R. S. § 720. The specific exception of § 265 was inapplicable to the Local Loan Company situation. Furthermore, this case involved a *res* only in the sense that every bankruptcy proceeding involves a *res,* i. e., the estate.

Other federal courts, since the adoption of the Judicial Code, have continued to enjoin relitigation of settled issues.[18]

We think it may be accurately stated that for more than half a century there has been a widely accepted rule sup-

---

[18] *St. Louis-San Francisco Ry.* v. *McElvain,* 253 F. 123 (1918) (validity of mortgage foreclosure); *Wilson* v. *Alexander,* 276 F. 875 (1921) (defeasibility of title to land); *Hickey* v. *Johnson,* 9 F. 2d 498 (1925) (validity of deeds to Indian land); *American Surety Co.* v. *Baldwin,* 2 F. Supp. 679 (1933) (liability of surety on appeal bond); *Sterling* v. *Gredig,* 5 F. Supp. 329 (1932) (validity of provisions in a will); *Hesselberg* v. *Aetna Life Ins. Co.,* 102 F. 2d 23 (1939) (validity of insurance policy).

porting the power of federal courts to prevent relitigation. There are adequate precedents directly in point and others which recognize that the rule exists and is sound. Some at one time involved a *res*. A number applied the same rule when a *res* was never in the hands of the court. Not a case nor a text book is cited to support the Court's present position. No articles in periodicals suggest the propriety or desirability of so positive a change, except a single query as to the logic of the relitigation development.[19] Though the Judicial Code received careful analysis before adoption,[20] no language was inserted to disavow the settled construction of the reënacted section. *Dial* v. *Reynolds,* 96 U. S. 340, said by the Court to be a "relitigation" case, did not involve a decree. In a federal suit to quiet title an injunction was sought to forbid a state action in ejectment. It is in line with *Kline* v. *Burke Construction Co.,* 260 U. S. 226, but not even persuasive on the question of relitigation or execution of decrees.

We turn now briefly to the original and auxiliary decrees in the two cases under consideration. In the *Toucey* case, his suit in equity against the insurance company for restoration of an insurance policy and payments for benefits under it on the ground of the fraud of the company was decided against Toucey. An assignee of Toucey's in privity with him sought to relitigate the same issues in a state court. The federal court which entered the original decree enjoined on supplemental bill "retrial, reconsideration or readjudication" of the settled issues and the prosecution of the state action.[21]

---

[19] See Taylor and Willis, *The Power of Federal Courts to Enjoin Proceedings in State Courts,* (1933) 42 Yale L. J. 1169, 1176. Cf. Warren, *Federal and State Court Interference,* (1930) 43 Harv. L. Rev. 345, 378.

[20] Senate Report No. 388, 61st Cong., 2d Sess., (1910), p. 2.

[21] Cf. *Toucey* v. *New York Life Ins. Co.,* 102 F. 2d 16, 20; *Equitable Life Assur. Soc.* v. *Wert,* 102 F. 2d 10.

In the *Iowa-Wisconsin Bridge Co.* case, a decree, invalidating a certain mortgage and bonds issued in consideration of claimed indebtedness after protracted litigation, was entered December 1, 1936, in a mortgage foreclosure suit brought in a federal court by the bondholders. This decree became final.[22] Thereafter parties to the proceedings sought to litigate, in the state courts of Delaware, the validity of certain items of the indebtedness which are alleged to form the basis for the bond issue and to have been invalidated by the former federal decree. A supplemental and ancillary bill was filed by the Bridge Company in the original federal court suit seeking an injunction against the relitigation of the already adjudicated causes of action. The District Court granted the injunction on a finding that the causes declared upon in Delaware had been settled by the federal litigation.[23]

These summary statements show plainly, it seems to us, that the injunctions now set aside by this Court were issued within the recognized rule that federal courts may protect their decrees by prohibiting relitigation, without violation of § 265 as heretofore understood and interpreted. Both decrees should be affirmed.[24]

The CHIEF JUSTICE and MR. JUSTICE ROBERTS concur in this dissent.

---

[22] 98 F. 2d 416, cert. denied, 305 U. S. 650.

[23] See, for an understanding of the complexities of the issues already settled: *Bechtel Trust Co.* v. *Iowa-Wisconsin Bridge Co.*, 19 F. Supp. 127; *First Trust & Savings Bank* v. *Iowa-Wisconsin Bridge Co.*, 98 F. 2d 416; *Phoenix Finance Corp.* v. *Iowa-Wisconsin Bridge Co.*, 115 F. 2d 1.

[24] It might be noted that § 265 is recognized as merely a limitation on general equity powers, *Smith* v. *Apple*, 264 U. S. 274, while the Norris-LaGuardia Act, 47 Stat. 70, is a denial of jurisdiction to enjoin. "No court of the United States . . . shall have jurisdiction to issue any . . . injunction in a case involving or growing out of a labor dispute, except . . ."